RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0050p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JARRETT HAMILTON,

        *Plaintiff-Appellant,*

     *v.*

GENERAL ELECTRIC COMPANY,

        *Defendant-Appellee.*

No. 08-5023

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 06-00659—Thomas B. Russell, District Judge.

Argued: October 22, 2008

Decided and Filed: February 12, 2009

Before: MOORE, GRIFFIN, and BRIGHT, Circuit Judges.[*]

_____

**COUNSEL**

**ARGUED:** Philip C. Kimball, Louisville, Kentucky, for Appellant. Bobby C. Simpson, GE CONSUMER & INDUSTRIAL, Louisville, Kentucky, for Appellee. **ON BRIEF:** Philip C. Kimball, Louisville, Kentucky, Edwin Sharp Hopson, Sr., WYATT, TARRANT & COMBS, Louisville, Kentucky, for Appellant. Bobby C. Simpson, GE CONSUMER & INDUSTRIAL, Louisville, Kentucky, for Appellee.

     MOORE, J., delivered the opinion of the court, in which BRIGHT, J., joined. GRIFFIN, J. (pp. 15-22), delivered a separate dissenting opinion.

_____

[*]The Honorable Myron H. Bright, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

## OPINION

KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant, Jarrett Hamilton ("Hamilton"), appeals the district court's grant of summary judgment to defendant-appellee General Electric Company ("GE"). Hamilton, a former GE employee, alleges that he was terminated in retaliation for having filed an age-discrimination claim against GE with the Equal Employment Opportunity Commission ("EEOC"), and he appeals dismissal of claims he brought under the Kentucky Civil Rights Act. Ky. Rev. Stat. Ann. § 344.280(1).

We **REVERSE** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND[1]

Before he was terminated in August 2005, Hamilton had worked for GE in Louisville, Kentucky over the course of three decades. He began working for GE in 1974, and except for a few periods when he was laid off for non-disciplinary reasons, Hamilton held a variety of positions with GE. Prior to 2004, Hamilton's disciplinary record was relatively clean; he was disciplined only three times, twice because of conflicts with coworkers and once for having beers in his car.[2] In 2004, the relationship

---

[1]Many material facts in this case are in dispute. This section will highlight these points of contention, but because we are reviewing the grant of a motion for summary judgment to GE, we must consider all of the facts in the light most favorable to Hamilton. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 520 n.1 (6th Cir. 2007).

[2]There is some disagreement in the record as to the exact date of each of these incidents. According to Hamilton's deposition, he was suspended for a week in 1977 due to a fight with a coworker. Joint Appendix ("J.A.") at 80-81 (Hamilton Dep. at 40-41). Hamilton stated that he was next suspended in 1992 after a disagreement over work responsibilities with another coworker. J.A. at 81-82 (Hamilton Dep. at 41-42). Hamilton stated that his final suspension for having beers in his car occurred around 1997. J.A. at 82 (Hamilton Dep. at 42). In his brief, however, Hamilton asserts that he was disciplined twice in 1977 and once in 1992. Hamilton Br. at 7. Regardless of whether the final incident occurred in 1992 or 1997, Hamilton's disciplinary record had been clean for nearly a decade when the problems described infra began in 2004.

between GE and Hamilton began to sour, and the series of events leading to this appeal ensued.

On June 18, 2004, Frank Whitehouse ("Whitehouse"), Manager of Plant Relations for GE, waited by the front gate of the plant looking for Hamilton. Whitehouse asserts that he was waiting for Hamilton because, recently, GE managers had been unable to locate Hamilton when he was supposed to be working. J.A. at 47 (Whitehouse Aff. at 1). Hamilton asserts that Whitehouse's decision to wait for Hamilton was "the beginning of Whitehouse's campaign to 'get' Jarrett Hamilton." Hamilton Br. at 8. When Hamilton appeared at the gate, Whitehouse confronted him and asked him to explain his absence. Hamilton stated that he had been on his 30-minute lunch break. J.A. at 47-48 (Whitehouse Aff. at 1-2). However, after examining Hamilton's time card, Whitehouse determined that Hamilton had been gone for more than 30 minutes, and, as a result of this violation of GE policy, GE suspended Hamilton for a month.[3] *Id.*

When Hamilton returned to work on July 24, 2004, another incident arose. Hamilton asserts that when he got to work, he asked his supervisor to honor his medical restrictions. J.A. at 77 (Hamilton Dep. at 37). Hamilton states that when he did this, his supervisor suddenly started yelling at him and called for the guards to remove Hamilton. *Id.* Hamilton says that he left the building rather than be removed by the guards and that later, when he sought help at the union hall,[4] he learned that GE had terminated him. J.A. at 77-78 (Hamilton Dep. at 37-38). GE alleges that Hamilton was terminated in July 2004 because he was insubordinate and refused to follow the direction of his supervisor. J.A. at 36 (Human Resources Manager Michael Luvisi Aff. at 2).

After this termination, the union intervened, and Hamilton, GE, and the union signed a Last Chance agreement ("LCA") on August 17, 2004. J.A. at 32 (LCA). This LCA gave Hamilton his job back in exchange for his agreement that he would comply

---

[3]In his brief, Hamilton contends that he never left GE's premises that day and does not concede that he was gone for more than 30 minutes. Hamilton Br. at 7-8.

[4]Hamilton was a member of the International Union of Electrical Workers, Local 761.

with all of GE's rules and that if he violated any, he would be subject to immediate termination. *Id.* Hamilton also agreed that if, in the future, GE terminated him for violating the LCA, "any grievance filed protesting the discharge [will] not be subject to arbitration and that no legal action respecting said discharge will be filed." *Id.* The LCA was to be in effect for two years. *Id.*

For almost a year following the LCA, Hamilton continued to work for GE without incident. On May 6, 2005, Hamilton voluntarily came in to work on Kentucky Oaks Day, an informal holiday for many GE workers. Hamilton asserts that he volunteered to work only because he was told that he would be sanding doors and would not be required to work on the line. J.A. at 84 (Hamilton Dep. at 44). GE asserts that Hamilton knew that he could be assigned to work anywhere within one of its plant buildings that day. J.A. at 38 (Operations Leader Terry Bale Aff. at 1). During the work day, a supervisor told Hamilton to take his lunch early and then to go work on the line. J.A. at 38, 85 (Bale Aff. at 1; Hamilton Dep. at 45). From this point on, Hamilton's and GE's accounts of the incident differ. Hamilton states that because he felt that he was not required to comply with either of these orders, he asked to see a union steward. J.A. at 85-86 (Hamilton Dep. at 45-46). Hamilton explains that his supervisor then started yelling at him, so he went to the line and began to work. *Id.* Hamilton asserts that while he was working on the line, his supervisor called the guards and had them escort Hamilton out of the building. *Id.*

The supervisor involved in the incident, Terry Bale ("Bale"), explains that after he told Hamilton to work on the line, Hamilton asked for a union representative. J.A. at 38-39 (Bale Aff. at 1-2). Bale states that he offered to go find a union representative but that he ordered Hamilton to work on the line in the interim. *Id.* According to Bale, Hamilton continued to refuse to work and walked away from Bale, so Bale called the guards and had Hamilton removed from the plant. *Id.* When Hamilton returned to work the next Monday he learned that he had been terminated. Hamilton Br. at 11. The Union intervened again, and Hamilton was reinstated but given a 30-day suspension.

*Id.* On May 20, 2005, while serving this suspension, Hamilton filed an age-discrimination charge against GE with the EEOC.

Hamilton testified that when he returned to GE in June of 2005, after filing his EEOC complaint, his supervisors greatly intensified their scrutiny of his work and harassed him more than they ever had before. J.A. at 113 (Hamilton Dep. at 91); Hamilton Br. at 12. In the months between Hamilton's return and his final termination, the relationship between GE and Hamilton continued to be strained. On July 28, 2005, Hamilton and his union representative met with Donald Blair ("Blair") to discuss what GE considered to be ongoing deficiencies in Hamilton's job performance. J.A. at 40-41 (Blair Aff. at 1-2); J.A. at 42 (Blair Memo). GE conceives of this meeting as having provided Hamilton with "a reprieve from the LCA." GE Br. at 7. Hamilton insists that during this time, GE was scrutinizing his behavior in an effort to create reasons to discipline him. Hamilton Br. at 12. During this period, Hamilton overheard Bale and another supervisor discussing and making light of Hamilton's EEOC complaint. J.A. at 97-98 (Hamilton Dep. at 62-63).

The final event that led to this lawsuit occurred on August 9, 2005, when the line that Hamilton was working on broke down, leaving Hamilton with no work. The parties agree that when this happened, Hamilton went to the lunchroom to eat his lunch. Hamilton Br. at 14; GE Br. at 7. The events that followed are highly contested. According to Hamilton, after he had put his food in the microwave, Blair told him to move some skids. J.A. at 90 (Hamilton Dep. at 55). Hamilton says that he agreed to do the work, but that seconds later, while he was still putting his food away, Blair and Bale came back into the lunchroom and told him to gather his belongings and leave the plant immediately. *Id.* Hamilton asserts that he left the plant quietly and without swearing or throwing things. J.A. at 92-94 (Hamilton Dep. at 57-59). According to Bale and Blair, after the assembly line broke down, they found Hamilton in the lunchroom and asked him to move the skids. J.A. at 39, 41 (Bale Aff. at 2, Blair Aff. at 2). Bale and Blair assert that after a few minutes had passed, they returned to the lunchroom and found Hamilton there, continuing to prepare his food. *Id.* Both Bale and Blair state that

after Bale suspended Hamilton and as they were escorting him out of the plant, Hamilton swore at them and threw his badge down rather than handing it to either man. *Id.*

This incident led to Hamilton's termination, and on August 15, 2005, GE sent Hamilton a letter reading as follows:

> Your employment with GE is being terminated as a result of your unacceptable conduct and behavior in the workplace. Despite repeated verbal and written warnings, you have failed to abide by the Appliance Park Rules of Conduct and GE's policies. . . . Subsequent to the [LCA] you engaged in additional unacceptable conduct on more than one occasion. You refused specific work directions from your supervisor, and used unacceptable foul and abusive language.

J.A. at 34 (Whitehouse Ltr. to Hamilton).

On December 14, 2006, Hamilton filed suit against GE in state court, claiming that GE had violated the Kentucky Civil Rights Act ("KCRA") by terminating him in retaliation for having filed an EEOC complaint. *See* Ky. Rev. Stat. Ann. § 344.280(1). On December 26, 2006, GE filed a notice of removal to the district court based on diversity jurisdiction. *See* 28 U.S.C. §§ 1332(a)(1); 1441. After discovery, GE moved for summary judgment and argued that, by signing the LCA, Hamilton had waived his right to bring this action and that his termination was the result of ongoing behavior problems which had begun before he filed his EEOC complaint.

On November 29, 2007, the district court issued an opinion granting GE's motion for summary judgment. The district court concluded that the LCA did not bar Hamilton's suit. The district court granted GE's motion for summary judgment because it found that Hamilton could not establish a prima facie case of retaliatory firing because he could not show that his EEOC complaint caused his termination. The district court also noted that even if Hamilton could establish a prima facie case, Hamilton could not show that GE's proffered reason for firing him, ongoing behavior problems, was pretextual.

On appeal, Hamilton argues that he provided enough evidence to establish a prima facie case of retaliatory termination. Hamilton states that the evidence he

presented of temporal proximity between his EEOC complaint and his termination accompanied by the fact that his bosses belittled his complaint and heightened their supervision of him after he filed his EEOC complaint was sufficient to establish a causal connection between his EEOC complaint and his termination. Hamilton also asserts that he made a sufficient showing of pretext by "disputing the factual basis for the discharge and showing that it was contrived to fire him." Hamilton Br. at 17. In response, GE argues that the district court correctly concluded that Hamilton failed to prove retaliation. GE also asserts that the district court erred in its conclusion that the LCA does not bar this action and urges us to conclude that Hamilton has waived his right to bring this suit.

## II.  ANALYSIS

### A.  Standard of Review

We review the district court's grant of summary judgment de novo. *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007). Summary judgment should be granted only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When we review a motion for summary judgment, we must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.  Waiver Based on the LCA

On appeal, GE argues that by signing the LCA, Hamilton "waived his right to proceed to court should GE in the future and during the term of the LCA determine that he had violated the LCA and terminate his employment." GE Br. at 22. We agree with the district court's conclusion that the LCA does not bar this action.

We have held that "[i]t is the general rule in this circuit that an employee may not prospectively waive his or her rights under . . . Title VII." *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 584 (6th Cir. 1995). We further explained that:

> An employer cannot purchase a license to discriminate. An employment agreement that attempts to settle prospective claims of discrimination for job applicants or current employees may violate public policy . . . unless there were continuing or future effects of past discrimination, or unless the parties contemplated an unequivocal, complete and final dissolution.

*Id.* at 585 (citation and footnote omitted).[5] Though Hamilton does not bring any Title VII claims and instead sues under the KCRA, we have held that "[t]he language of the KCRA generally tracks the language of Title VII and, thus, 'should be interpreted consonant with federal interpretation.'" *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 793 (6th Cir. 2000) (quoting *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 821 (Ky. 1992)).

GE asserts that Kentucky law permits waivers of statutory claims. However, the two cases that GE cites to support this assertion concern agreements to settle existing claims based on an identified violation rather than waivers of prospective claims based on possible future violations. In *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 101 (Ky. 2003), the plaintiffs brought suit to recover for injuries that they suffered when a certain pesticide was sprayed on their house. The agreement that the Kentucky Supreme Court enforced was a settlement agreement in which the plaintiffs agreed to waive all claims against the defendant relating to the specific incident that had occasioned the plaintiffs' suit. *Id.* at 101-02. In *American General Life & Accident Insurance Co. v. Hall*, 74 S.W.3d 688, 689-90 (Ky. 2002), the plaintiff filed suit alleging that her boss had sexually harassed her. The plaintiff also sought and received workers' compensation benefits based on her assertion that she suffered from psychological problems as a result of this sexual harassment. *Id.* The Kentucky Supreme Court held that because the

---

[5]We have "consistently upheld the validity of pre-dispute mandatory arbitration agreements," including those which "extend[] to agreements to arbitrate statutory employment discrimination claims. *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004). However, such pre-dispute arbitration agreements are enforceable only if they provide the employee "'with an effective substitute for the judicial forum to pursue her Title VII claims.'" *Id.* at 492 (quoting *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 659 (6th Cir. 2003) (en banc)). GE does not argue that the LCA was an arbitration agreement, and the LCA purports to bar arbitration and legal remedies. J.A. at 32 (LCA) ("If Mr. Hamilton is discharged as a result of the Company's determination that he has violated this Agreement, it is agreed that any grievance filed protesting the discharge *not be subject to arbitration and that no legal action* respecting said discharge will be filed." (emphasis added)). Accordingly, the waiver in the LCA leaves Hamilton with no forum in which to pursue his retaliatory-discharge claims, and it is not a valid waiver under our precedent relating to waivers contained in arbitration agreements.

plaintiff chose to seek workers' compensation benefits, she had waived her ability to sue based on the same conduct of the employer. *Id.* at 692-93.

Both of the cases GE cites hold that when an individual is faced with a known violation, he or she may be able to waive his or her ability to pursue further legal action relating to *that past violation*. Neither case, however, stands for the proposition that, under Kentucky law, an employee can prospectively waive statutory claims relating to potential future violations. Hamilton signed the LCA nearly a year before he was terminated, and the LCA does not represent his choice to forego future remedies based on GE's future statutory violations. Accordingly, because Kentucky law does not dictate the contrary result, we conclude that Hamilton's LCA does not bar him from pursuing this legal action.

## C. Retaliatory Termination

Hamilton's KCRA claim that he was terminated in retaliation for filing an EEOC claim is evaluated using the same standard that we apply to federal Title VII claims. *See Ford v. Gen'l Motors Corp.*, 305 F.3d 545, 552-53 & n.3 (6th Cir. 2002). When based on circumstantial evidence, this claim is evaluated using the burden-shifting analysis described by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-05 (1973). *See also Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003); *Ford*, 305 F.3d at 552-53. The burden first falls on Hamilton who must establish a prima facie case of retaliation by showing that: "(1) he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008). Once Hamilton has made out a prima facie case, the burden shifts to GE "to produce evidence of a legitimate, nondiscriminatory reason for its actions." *Id.* If GE meets this burden, Hamilton bears the burden of demonstrating that this legitimate reason is pretextual. *Id.*

### 1. Causal Nexus

The first three parts of the prima facie case are undisputed on appeal; Hamilton has established that he filed an EEOC complaint alleging age discrimination, GE knew about the complaint, and GE terminated his employment. GE contends, and the district court agreed, that "Hamilton cannot establish any causal connection between his termination and his filing an EEOC charge." GE Br. at 11. We cannot agree.

In analyzing causation, the district court stated that "[u]nder Sixth Circuit precedent, . . . temporal proximity is not enough to satisfy the causation element of Plaintiff's prima facie case." J.A. at 25 (Dist. Ct. Op. at 11). We have recognized, however, that in some cases temporal proximity may be sufficient to establish causation. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523-26 (6th Cir. 2008). In *Mickey*, we held that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Id.* at 525. Hamilton's case, however, does not rest on temporal proximity alone. Instead, Hamilton alleges that his bosses heightened their scrutiny of him after he filed his EEOC complaint. *See Jones v. Potter*, 488 F.3d 397, 408 (6th Cir. 2007) (noting that an employer cannot conceal an unlawful discharge by closely observing an employee and waiting for an ostensibly legal basis for discharge to emerge). On a motion for summary judgment, we view the facts in the light most favorable to Hamilton, and he has testified in his deposition that GE increased its scrutiny of him after he filed his EEOC complaint. The combination of this increased scrutiny with the temporal proximity of his termination occurring less than three months after his EEOC filing is sufficient to establish the causal nexus needed to establish a prima facie case.

The district court minimized the importance of the scrutiny that Hamilton alleges because the district court found that from the time of the LCA on, GE understandably supervised Hamilton's work carefully. Hamilton does not argue that his work had not been scrutinized before, but he states that the level of scrutiny increased greatly after he

filed the EEOC complaint. The fact that the scrutiny *increased* is critical. The district court also emphasized Hamilton's prior disciplinary history. Though this case includes information about the pre-existing relationship between Hamilton and GE, we must decide what made GE fire Hamilton when it did. GE did not terminate Hamilton until *after* he filed an EEOC complaint alleging age discrimination. We hold that this temporal proximity of less than three months combined with the assertion that GE *increased* its scrutiny of Hamilton's work only after the EEOC complaint was filed are sufficient to establish the causation element of a prima facie case of retaliatory termination.

GE asserts that after Hamilton filed his EEOC complaint in May 2005, GE had cause to fire him in June 2005, but it chose not to, instead warning him and letting him continue working until his termination in August 2005. GE argues that because it did not fire Hamilton at the first opportunity that arose after he filed his EEOC complaint, the choice to fire him must not have been retaliatory. GE asserts that its "favorable treatment [i.e., its decision to give Hamilton another chance] dissolves any inference of retaliatory motive on the part of GE." GE Br. at 13. Were we to adopt GE's position, any employer could insulate itself from a charge of retaliatory termination by staging an incident to display its purported "favorable treatment" and then waiting for a second opportunity to terminate the employee. Accordingly, we refuse to adopt GE's argument, and we hold that an employer's intervening "favorable treatment" does not insulate that employer from liability for retaliatory termination.

**2. Pretext**

Because we conclude that Hamilton has established a prima facie case of retaliation, we consider whether GE has satisfied its burden of producing a legitimate nonretaliatory reason for terminating Hamilton. GE argues that it terminated Hamilton because of "his persistent failure to abide by GE's Rules of Conduct and the LCA." GE Br. at 14. Assuming that this explanation constitutes a valid reason for termination, we next turn to the question of whether Hamilton has sufficiently established that this

proffered reason is pretextual. We hold that Hamilton has made a sufficient showing of pretext and that summary judgment is not proper.

We have held that when an "employer . . . waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee," the employer's actions constitute "the very definition of pretext." *Jones*, 488 F. 3d at 408. Hamilton has sufficiently alleged that this is exactly what happened to him; GE increased its surveillance of his work after he filed an age-discrimination complaint with the EEOC and then GE waited for an opportunity to fire him. In addition to asserting that GE watched and waited for him to make a mistake, Hamilton contests the factual basis for his termination. Hamilton's supervisors at GE suggest that they gave him minutes to put his lunch away before they returned to the lunchroom and fired him for refusing to follow orders. They also assert that when they returned to the lunchroom, Hamilton used profanity as they escorted him out. Hamilton contests these facts and states that he was preparing to return to work as requested but that only seconds passed before his supervisors returned to the lunchroom and fired him. He also denies using profanity. When we view these facts in the light most favorable to Hamilton, it is clear that there is a genuine issue of material fact. Based on the facts Hamilton alleges, a reasonable fact-finder could determine that GE waited for, and ultimately contrived, a reason to terminate Hamilton to cloak its true, retaliatory motive for firing him.

GE asserts that "Hamilton's subjective skepticism regarding the truth of GE's proffered reason does not raise a triable issue as to pretext" and cites *Mitchell v. Toledo Hospital*, 964 F.2d 577, 584 (6th Cir. 1992), in support of this proposition. GE Br. at 17 & n.16. GE's reliance on this case is misplaced. In *Mitchell*, the plaintiff was terminated for "misuse of hospital property." *Id.* at 580. The plaintiff admitted all of the conduct underlying this termination but contended that her conduct did not constitute "misuse of hospital property." *Id.* at 580-81. This court noted that plaintiff did only two things to rebut this proffered neutral reason for her termination: she testified that she had heard that some other employees had done something allegedly similar but had not

been fired, and she denied that "her actions on December 6-9, 1988 constituted 'misuse of Hospital property.'" *Id.* at 584.  This court determined that "the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a race discrimination claim to withstand a motion for summary judgment." *Id.* at 585.  Hamilton has done much more than deny GE's reason for firing him; he contests the facts underlying the incident that led to his termination and he alleges that after he filed his EEOC age-discrimination complaint GE heightened its supervision of him in an attempt to find a seemingly legitimate reason to fire him.  The plaintiff in *Mitchell* made no such showings.

Further, the holding in *Mitchell* must be read in light of the Supreme Court's subsequent holding in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).  In *Reeves*, the Supreme Court explained the standard that a court must apply when it is reviewing a motion for judgment as a matter of law or a motion for summary judgment:

> In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.  That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."

*Id.* at 150-51 (citations omitted) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2529 at 300 (2d ed. 1995)).  This reaffirmation of the familiar standard for review of a grant of summary judgment reinforces the fact that *Mitchell* cannot apply to cases, such as this one, in which the nonmoving party contests material facts.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  Unlike the plaintiff in *Mitchell*, Hamilton has contested the facts underlying his termination and has alleged a question of material fact sufficient to defeat a motion for summary judgment.

Accordingly, we hold that Hamilton has met his burden of raising a genuine issue of material fact regarding GE's motivation for terminating him. Because we also conclude that Hamilton has sufficiently alleged a causal connection between his termination and his EEOC complaint, we reverse the district court's grant of summary judgment to GE.

### III. CONCLUSION

For the reasons discussed above, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

———————————

## DISSENT

———————————

GRIFFIN, Circuit Judge, dissenting. I respectfully dissent. I agree with the well-reasoned opinion of the district court and would affirm.

I.

First, in this diversity of citizenship case governed by Kentucky state law, I agree with the district court and the majority that the waiver signed by Hamilton as part of his Last Chance Agreement was ineffective to bar this prospective civil rights retaliation claim.

However, I respectfully dissent from the majority's holdings that under Kentucky law, the district court erred in ruling that Hamilton failed to sustain his burdens of demonstrating the "causal connection" element of his prima facie case and establishing that defendant's legitimate reasons for discharge were pretextual.

II.

The events of August 9, 2005, which resulted in Hamilton's termination, are consistent with and are further illuminated by Hamilton's well-documented and undisputed pattern of defiance at General Electric Company ("GE"). In my view, his termination was merely the culmination of his serious disciplinary history.

In 2004, a year before Hamilton filed his age discrimination charge, various managers reported that they were unable to locate Hamilton at work on several occasions. As a result, Frank Whitehouse, manager of plant relations, waited by the front gate on June 18, 2004, in an attempt to find him. On that day, electronic records confirm that Hamilton clocked out at 7:54 AM and returned over sixty minutes later. Because lunch breaks at GE are thirty minutes, Whitehouse questioned Hamilton about his whereabouts. Hamilton explained that he had taken his thirty-minute lunch break but could not account for the additional thirty minutes. GE then suspended Hamilton

without pay for thirty days because he violated its written rule forbidding employees from leaving work without permission.

When Hamilton returned to work on July 24, 2004, he refused to perform assigned jobs. As a result, human resources manager Michael Luvisi terminated Hamilton for insubordination.

Fortunately for Hamilton, the union intervened on his behalf. It negotiated a Last Chance Agreement, which Hamilton signed on August 17, 2004. Under the Last Chance Agreement, Hamilton conceded that GE's decision to terminate him was "proper and for just cause." GE agreed to reinstate Hamilton's employment without back pay in exchange for Hamilton's agreement to "strictly adhere" to the terms and conditions stated in the Last Chance Agreement, including the requirement that he comply "with all of the Appliance Park Rules of Conduct." It specifically warned Hamilton that "[a]ny violation of the Rules of Conduct will result in immediate discharge . . . ."

Despite the Last Chance Agreement, less than a year later, Hamilton again behaved insubordinately toward GE management. On May 6, 2005, manager Terry Bale directed Hamilton and another employee to take their lunch breaks early so that they would be available to work on an assembly line. When Hamilton refused to obey Bale's directive that he report to his assigned work station, Bale called security guards who escorted Hamilton off GE property.

Although GE determined that Hamilton's conduct on May 6, 2005, violated the Last Chance Agreement and made the preliminary decision to terminate him, the union again intervened on Hamilton's behalf. At the union's request, GE agreed to place Hamilton on unpaid leave for thirty days instead of discharging him. Significantly, it was *while* Hamilton was serving that unpaid thirty-day suspension that he filed his age discrimination charge with the EEOC on May 20, 2005.

On July 28, 2005, Hamilton's supervisor, Donald Blair, convened a meeting with Hamilton and the union to discuss his continuing concerns about Hamilton's alleged refusal to follow instructions, tardiness at the start of his shift, unauthorized breaks, and

routine absences from his work area.  Blair required that Hamilton report to him every morning for daily instructions and reminded him to adhere to his scheduled break times and GE's rules of conduct.

The lunch break incident on August 9, 2005, which led to Hamilton's discharge was merely another link in the long chain of Hamilton's documented challenges to his employer's authority.  On that day, Hamilton's supervisors once again attempted unsuccessfully to find him.  It was only when they could not locate him that they searched for and found him in the lunch room.

At oral argument, Hamilton's counsel conceded that his client's lunch break on August 9, 2005, was "unauthorized."  Moreover, no reasonable jury would believe Hamilton's contention that during his *unauthorized* lunch break, he timely complied with his supervisor's instructions to move skids.  According to Hamilton, Blair gave him only a few "seconds" to begin the task, and while he was still putting away his food, Blair and Bale returned to the lunch room and ordered him to leave the plant.  Blair and Bale contend that they allowed Hamilton several minutes to put away his lunch before they returned.  Obviously, the time it requires for a supervisor to leave the lunch room in the large plant and then return is more than a few "seconds."  Under these circumstances, Hamilton's failure to comply with Blair's orders clearly constituted refusal to comply with "specific work directions from your supervisor" as referenced in defendant's August 15, 2005, termination letter.

### III.

The majority acknowledges that "the burden first falls on Hamilton" to "establish a prima facie case of retaliation by showing that:  . . . there was a causal connection between the protected activity and the adverse employment action."  It then incorrectly concludes that Hamilton met his burden of proving the "causation" element based on two factors:  (1) the temporal proximity between his filing of the EEOC charge, and (2) GE's alleged "heightened scrutiny" of him after he filed the charge.  In relying on these considerations, the majority ignores the undisputed circumstances leading to Hamilton's termination and his well-documented pattern of insubordinate behavior at GE.

The majority's reliance on temporal proximity as establishing the causation element of the prima facie case is untenable. On at least *three* occasions in the year preceding his filing of the charge, GE suspended or terminated Hamilton. He signed the Last Chance Agreement *before* he filed his EEOC charge. In fact, Hamilton filed his charge *while* serving an unpaid, thirty-day suspension for his insubordination on May 6, 2005. Thus, he was already on the brink of termination when he complained about discrimination and when GE discharged him for the last time.

In a similar case in which the plaintiff employee had a history of disciplinary problems that preceded the filing of the discrimination charge, the Eighth Circuit rejected the employee's attempt to immunize herself from termination by complaining:

> The wisdom of [the] rule [that temporal proximity, by itself, is not enough to present a genuine issue of material fact in a retaliation case] is evident in a case such as this, where the employee was accused of insubordination *before* she notified the employer of her protected activity. Insubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action. Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity.

*Hervey v. County of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008) (holding that the employer's adverse action against the plaintiff "was a logical consequence of [the plaintiff's] pre-existing disciplinary problems," and the plaintiff "cannot create a submissible case of unlawful retaliation by interjecting her announcement of a discrimination claim in the middle of a previously scheduled meeting to discuss her absences from work.") (internal quotations and citations omitted). Other decisions have recognized the same. *See*, *e.g.*, *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (holding that the plaintiff failed to establish the causation element of the prima facie case for retaliation where "an extensive period of progressive discipline" began five months before the plaintiff filed his EEOC charges); *Zenni v. Hard Rock Cafe Int'l, Inc.*, 903 F. Supp. 644, 655-56 (S.D.N.Y. 1995) (holding that the plaintiff did not establish the causation element of the prima facie case for retaliation where he

committed infractions and the employer negatively evaluated him before he complained about alleged discrimination); *Lawson v. Getty Terminals Corp.*, 866 F. Supp. 793, 804 (S.D.N.Y. 1994) (holding that the plaintiff failed to establish the causation element of the prima facie case for retaliation where his employer informed him that it was dissatisfied with his performance and verbally counseled him about his failure to perform required job duties before he complained about alleged discrimination).

IV.

The majority also incorrectly relies on GE's alleged "heightened scrutiny" of Hamilton after he complained as establishing the causation element. GE was *entitled* to heavily scrutinize and discipline Hamilton, an employee with a history of insubordination. *Cf. Conley v. City of Findlay*, No. 06-4664, 266 F. App'x 400, 409-10 (6th Cir. 2008) (unpublished) (affirming district court's grant of summary judgment in favor of the employer where the plaintiff's "entire retaliation argument is dedicated to challenging the district court's conclusion that an employer may discipline an employee that it views as being more culpable in a harsher manner than it disciplines an employee that it deems to be less culpable.").

Moreover, contrary to the majority's observation that "[t]he fact that the scrutiny increased [after Hamilton filed the charge] is critical" and permits an inference of retaliation, the majority again ignores a crucial fact – the alleged "heightened scrutiny" began after Hamilton returned from the thirty-day unpaid suspension coinciding with the filing of his discrimination charge. Surely an employer may more closely observe an employee who is *returning* from sanction, particularly one like Hamilton, who was working under a Last Chance Agreement and had been suspended and terminated in the past. Indeed, Hamilton identifies no other similarly situated, non-complaining employee whom GE treated differently. *See Evans v. Prospect Airport Servs.*, *Inc.*, 286 F. App'x 889, 895 (6th Cir. 2008) (unpublished) (stating that "[b]eyond temporal proximity, other indicia of retaliatory conduct would include evidence that the plaintiff was treated differently . . . than similarly situated employees who had not exercised Title VII rights

. . . .") (citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1990)).

The Kentucky legislature certainly did not intend the anti-retaliation provision of the Kentucky Civil Rights Act to preclude employers from supervising their employees, particularly insubordinate ones. The majority's holding merely encourages sanctioned employees like Hamilton to file discrimination charges, thereby obtaining "instant immunity" from their employers' supervision and punishment. Contrary to the majority's sweeping construction of the anti-retaliation provision, the statute is designed to prevent employers from taking adverse action against employees who engage in protected conduct, not to function as a blindfold or "gag order" on an employer's ability to properly supervise its employees, particularly employees who have decisively demonstrated that they *require* closer supervision.

Under these facts, no reasonable jury could find that Hamilton met his burden of establishing a prima facie case for retaliation, and I respectfully dissent from the majority's ruling that he did.

V.

Next, assuming that Hamilton met his burden of establishing a prima facie case for retaliation, it was also *his* burden to demonstrate that GE's articulated legitimate, non-retaliatory reasons for terminating him were pretexts for retaliation. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008). The majority correctly assumes that GE's explanations for firing Hamilton – his persistent failure to abide by its rules of conduct and the Last Chance Agreement – were legitimate and non-retaliatory. However, it then concludes erroneously that a reasonable jury could find that GE's articulated reasons were pretexts for retaliation, holding that sufficient facts suggest that GE waited for a "legal, legitimate reason [to fire him] to fortuitously materialize" and then used that reason "to cover up [its] true, longstanding motivations" of retaliation.

Again, the majority ignores Hamilton's significant disciplinary history at GE, which long preceded the filing of his discrimination charge. When he filed his charge,

Hamilton had nearly exhausted his "nine lives" at GE. GE did not need to wait for legal, legitimate reasons to "fortuitously materialize" in order to fire Hamilton because he already *proved* on numerous occasions that he was more than willing to assist.

The August 9 infraction was representative of and consistent with his past behavior at GE: for whatever reason, he did not respect GE's rules or the authority of his supervisors or managers, and he paid the price by losing his job. The facts in this case are thus similar to those in *Conley*, in which we held that the employer's decision to terminate an employee for causing wastewater spills on three separate occasions was not a pretext for discriminating against her as a matter of law, even though she argued that the third spill was insufficient to justify her termination because it was of "minimal quantity." *Conley*, 266 F. App'x at 406-07. In *Conley*, we recognized that the third spill which immediately preceded the plaintiff's termination was merely one error among several made by the plaintiff, and that the City of Findlay, Ohio, lawfully discharged her "because of her unacceptable job performance in all three spills." *Id.* at 406.[1]

Here, as in *Conley*, Hamilton's final infraction on August 9 merely reinforced the accuracy of the label GE had already assigned to him, which in the words of Logan Pearsall Smith, was "plainly printed on the bottled essence of [his] past behavior." Accordingly, because no reasonable juror could find that GE's explanation for terminating Hamilton – his persistent and pervasive violation of its rules – was a pretext for retaliating against him, summary judgment was proper. *See Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007) (stating that "the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination."); *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 371 (6th Cir. 2007) (same); *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (stating that a "case should be dismissed" where "no reasonable juror could find that the employer's adverse employment action was pretextual.").

---

[1] Unpublished opinions of this court are not precedentially binding under the doctrine of stare decisis but may be considered for their persuasive value. *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007).

VI.

For these reasons, the district court correctly granted summary judgment in favor of GE on Hamilton's retaliation claim, and I would affirm that judgment. I therefore respectfully dissent.