**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2677-17T2

KIM ALSTON, f/k/a
KIM PARKER,

     Plaintiff-Appellant,

v.

CITY OF HOBOKEN, DAWN
ZIMMER, MELISSA LONGO,
QUENTIN WIEST, JOHN
MORGAN, HECTOR MOJICA,
and KIMBERLEY WILSON,

     Defendants-Respondents.

_____

Argued telephonically March 25, 2020 –
Decided July 14, 2020

Before Judges Koblitz, Whipple and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket Nos. L-5021-14 and L-1704-16.

Donald F. Burke argued the cause for appellant (Law Office of Donald F. Burke, attorneys; Donald F. Burke and Donald F. Burke Jr., on the briefs).

David J. Pack argued the cause for respondents (Hanrahan Pack, LLC, attorneys; David J. Pack, of counsel and on the brief; Kathy Ann Kennedy, on the brief).

PER CURIAM

Plaintiff Kim Alston appeals from a January 5, 2018 order denying her motion for judgment notwithstanding the verdict (JNOV) or for a new trial after the jury determined that plaintiff had waived her right to sue and, therefore, did not consider her retaliation claim under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. Because plaintiff was represented by counsel when she waived her right to sue, and she did not make the claim that discriminatory behavior occurred after she signed the waiver until after trial, we affirm.

Plaintiff and her cousin were employed by the City of Hoboken (the City). The cousin was disciplined for misbehavior. Plaintiff believed her cousin had been racially discriminated against by his superiors. When she complained to her cousin's supervisor, Hector Mojica, about the matter, plaintiff became verbally aggressive. Thereafter, she was disciplined for insubordination and conduct unbecoming a public employee.

Her union representatives negotiated the disciplinary charges. Plaintiff, represented by counsel, ultimately signed an agreement (the waiver) that she

2

would not bring any legal claim against the City and its employees in exchange for the City agreeing to spread her thirty-day suspension over six months and not demote her. Alleging that City employees retaliated against her for complaining about the discrimination against her cousin, plaintiff sued the City and some of its employees under the LAD. Following the trial court's instructions, the jury did not consider her retaliation claim, instead finding that the waiver precluded her ability to bring a claim under the LAD.

On appeal, plaintiff argues that the court erred because: (1) the waiver violated the LAD as against public policy; (2) the jury should not have been permitted to find that she waived her right to bring a retaliation claim; (3) the court should have entered a directed verdict in her favor; and (4) the court incorrectly dismissed certain defendants, barred relevant testimony and empaneled jurors improperly.

## I. Factual background.

The City had an affirmative action/anti-harassment policy that forbade discrimination and also retaliation against employees who complained about harassment.

In February 2011, plaintiff's cousin began working as a Hoboken parking enforcement officer. Over the years, the cousin filed numerous complaints that

he was harassed because of his sexual orientation. On April 9, 2014, he filed a complaint against Mojica. The complaint stated that he "got into a little bumper accident and was forced to take a drug test." Plaintiff's cousin believed Mojica required him to take the drug test because he was African American.

On April 10, 2014, plaintiff's cousin complained to Mojica that an employee made homophobic comments to him. That next day, he filed a complaint alleging that Mojica did not prevent the employee from making homophobic comments. Mojica reported the incident to John Morgan, director of transportation and parking, and Morgan then reported the incident to Kimberley[1] Wilson, the City's affirmative action officer. On April 24, 2014, Wilson confirmed receipt of plaintiff's cousin's complaint via memorandum and stated that she would "begin investigating [his] allegations immediately."

Plaintiff worked in the City's customer service department since 2010 and at the time of trial was a senior customer service representative. She became aware that her cousin was going to be terminated and on April 29, 2014, she confronted Mojica. The record provides various accounts of what occurred.

Plaintiff stated that the altercation began when she was sitting on a bench in the lobby and Mojica asked if she wanted to speak. They moved into a private

---

[1] The record contained various spellings for "Kimberley."

A-2677-17T2

room. Plaintiff stated that although she "didn't raise her voice," she "[m]ight have got[ten] a little excited." She accused Mojica of harassing her cousin and he told her: "[S]hut up, you don't know what you're talking about, you're not a supervisor."

According to Mojica, upon moving from the lobby to a private break room, plaintiff asked him why he reported her cousin. Plaintiff began yelling at him and calling him a "kiss ass." Mojica left the private room and plaintiff followed him. Mojica shouted at plaintiff to get away from him. He said this occurred in front of customers in the customer service department.

Other employees began to follow plaintiff and Mojica, and the incident ended in the hallway outside Morgan's office. Mojica told the acting administrative clerk of the City's parking utility, Anthony Riccardi, to get plaintiff away from him. The whole incident took seven minutes and five of those minutes were behind closed doors.

At the time of the incident, Morgan was meeting in his office with Michelle Ippolito, plaintiff's supervisor, when he heard yelling in the hallway. He could not determine what was being said, but when he opened his office door, he observed an upset plaintiff, Mojica, and Ricciardi. He instructed

Riccardi to take plaintiff outside the building and told Mojica he should not be yelling in the hallway.

According to Ippolito, plaintiff was "yelling because she was upset," and "was just raising her voice." Ippolito was trying to calm plaintiff when Riccardi told plaintiff to go outside. The incident occurred a few minutes before 4:00 p.m. and, with Morgan's permission, Ricciardi sent plaintiff home because it was only a few minutes prior to the end of the workday. According to Ricciardi, plaintiff was not asked to go home because of her behavior, but "because she was upset" and he "didn't want [the situation] to escalate." He never witnessed plaintiff yelling after she went outside the building.

Another employee testified that she heard plaintiff say to Mojica "that he's not a supervisor, that he's a[n] . . . . ass kisser." Customers could hear the argument and while plaintiff was loud, Mojica was not yelling.

After the altercation, Mojica told Morgan and Joel Mestre, president of the City's supervisors' union, that plaintiff was complaining about sexual harassment and retaliation towards her cousin.

After preparing disciplinary charges, Mellissa Longo, assistant corporation counsel, recommended a thirty-day suspension and demotion because she believed that, although plaintiff had no disciplinary history,

6

plaintiff's actions were "egregious." Longo believed plaintiff had been observed "yelling after and following a supervisor in front of the public" but could not remember who told her this information.

On April 30, 2014, the day after the incident, plaintiff's cousin was terminated. That same day, Longo delivered a notice of disciplinary charges to plaintiff and told her to contact her union. The proposed penalty for plaintiff was thirty days without pay and a demotion.

On May 30, 2014, City employees conducted a disciplinary hearing. Plaintiff was represented by both Diane Nieves Carreras,[2] president of plaintiff's union, the Hoboken Municipal Employees Association, and Merrick Limsky, an attorney who represented the union. Rather than proceed with the hearing, plaintiff asked Carreras to negotiate a deal because she worried about retaliation and believed appealing a disciplinary sanction was a lengthy process.

Plaintiff knew that a demotion would mean lower pay. Morgan testified that with permission of the law department, he was open to reducing the thirty-day suspension, but the law department did not agree to do so. After negotiations, the City agreed that plaintiff's thirty days without pay would be

---

[2] The record also referred to her as Diane Nieves.

A-2677-17T2

spread over six months so as not to be a financial burden, and she would not be demoted.

On June 23, 2014, Alysia Proko, assistant corporation counsel, sent a memorandum of agreement to plaintiff and her union representatives. It provided that plaintiff would plead guilty to insubordination, N.J.A.C. 4A:2-2.2(a)(2), conduct unbecoming a public employee, N.J.A.C. 4A:2-2.2(a)(6), and other sufficient cause, N.J.A.C. 4A:2-2.2(a)(12).

The agreement also provided that plaintiff and her union agreed to "irrevocably and unconditionally waive[], release and forever discharge[] any and all claims and/or rights they have or may have against the City and its directors, officers, administrators, employees, representatives, agents, heirs, attorneys and assigns from this matter." They also agreed "not [to] file any charge, claim or complaint in any forum against the City . . . concerning the matters referenced herein to seek any recovery and/or relief, except to the extent necessary to enforce their rights relating to the terms of this [m]emorandum of [a]greement."

Carreras testified that she did not explain the ramifications of the waiver with respect to bringing claims against the City. Limsky could not remember whether he did so. Quentin Wiest, the City's business administrator, conceded

8

that standard employee discipline negotiations generally required the employee to surrender claims against the City, but he did not know exactly what claims plaintiff had surrendered. Plaintiff, Carreras and Wiest signed the waiver. On July 1, 2014, four days after plaintiff signed the waiver, the City issued a final notice of disciplinary action (FNDA) stating that plaintiff had been observed "yelling at [her supervisor] in front of members of the public and other employees."

Many City employees believed plaintiff's penalty was harsh. For example, Carerras stated plaintiff's suspension was unusually excessive. Riccardi also believed a thirty-day suspension was "very excessive"; he never heard of anyone get that type of penalty or even be disciplined for arguing with a co-worker.

Mestre had never seen a thirty-day suspension before and asserted that for a heated argument, the maximum penalty was generally two days. Mestre complained to Morgan, Longo, and Wiest about plaintiff's penalty.

Plaintiff and other employees believed that defendants retaliated against her for complaining about her cousin's treatment. For example, prior to the incident, plaintiff was expecting to transfer from customer service to the municipal violations bureau, but while the disciplinary charges were pending, the transfer was cancelled. Wiest stated that the municipal judge did not want

9

plaintiff to transfer because of the pending disciplinary charges. However, according to Michael Korman, personnel officer for the City, Morgan held up the transfer. Plaintiff reported that Kerri Azzoline of the municipal violations bureau told her the transfer was approved, but at trial, Azzoline distanced herself from this statement.

Also, on Saturdays, customer service employees worked on a rotating basis. After plaintiff was disciplined, other customer service employees agreed to let plaintiff work their Saturday rotation to help alleviate the financial pressure of her thirty-day suspension without pay. When Morgan discovered that plaintiff had worked consecutive Saturdays, he changed the schedule to prevent this. According to Ippolito, Morgan raised a concern about plaintiff working on consecutive Saturdays, but did not raise a similar concern regarding other employees. The record is unclear as to whether this happened before or after plaintiff signed the waiver.

In addition, plaintiff was a single mother of a daughter and son who was hard of hearing. Plaintiff's son participated in the City's 2014 summer employment program and because he would arrive with his mother, whose workday started one hour before his, he would sit in the public sitting area outside the customer service office before his shift began. "[A]fter seeing [a]

young man [for] several days," Morgan, who testified that he did not know the boy was plaintiff's son, complained to Ippolito about this, stating that the City's assistant business administrator, Patrick Leary, did not want the child sitting there. However, when questioned by Mestre, Leary stated he had no concern with the child sitting there.

Morgan sometimes instructed Ippolito to discipline plaintiff for minor infractions and Ippolito believed Morgan's intent was to retaliate against plaintiff. For example, Morgan told Ippolito to instruct plaintiff she could not apply lipstick while at her desk, although she was actually putting on Chapstick. Ippolito was afraid of losing her job if she disobeyed. She complained to the mayor's office, but the mayor's staff told her to bring the issue to the City's business administrator. The record does not disclose when this occurred.

Because plaintiff was a senior customer service representative, she sat at a desk instead of standing at the customer service window. After plaintiff signed the waiver, Morgan required her to stand at the window. Ippolito complained to Morgan that "plaintiff would be better utilized at a desk" and handling the telephone and the computer, rather than standing at the window. This incident occurred after the waiver was signed. This relatively minor incident is the only one that definitely occurred after the waiver.

## II. Enforceability of the Waiver.

Plaintiff argues that the court erred because the waiver impermissibly limited her right under the LAD to bring an action against her employer for retaliation. The court found that plaintiff signed a waiver giving up her right to bring any claim against defendants, but it was a fact question for the jury whether she understood exactly what rights she waived. On the motion for a JNOV, the court stated that the waiver was valid inasmuch as plaintiff was not forced to sign it in order to receive an employment benefit. The court distinguished Rodriguez v. Raymours Furniture Co., 225 N.J. 343 (2016), stating that the contract of adhesion at issue in that case was "nothing like the negotiated agreement" at issue here.

To make out a prima facie case of retaliation, a plaintiff must demonstrate that he or she "engaged in a protected activity known by the employer, the employer unlawfully retaliated," and "participation in the protected activity caused the retaliation." Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629-30 (1995). Once the plaintiff establishes a prima facie case of retaliation, the defendant must "articulate a legitimate, non-retaliatory reason for the decision." Young v. Hobart W. Grp., 385 N.J. Super. 448, 465 (App. Div. 2005) (quoting Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 549 (App.

A-2677-17T2

Div. 1995)).  Finally, the plaintiff must demonstrate a discriminatory motive and show that the employer's stated "reason was merely a pretext for" discrimination. Ibid. (quoting Romano, 284 N.J. Super. at 549).

In Rodriguez, the issue before the Court was whether, as part of an employment application submitted, an employer could require an unrepresented employee to contractually limit the statute of limitations for the employee's possible future claim under the LAD.  225 N.J. at 346.  The Court ultimately concluded that requiring an employee, in a contract of adhesion, to agree to shorten the statute of limitations for his or her LAD claim was an abrogation of the employee's rights.  Id. at 364-67.

A contract of adhesion is one that is "presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars."  Vitale v. Schering-Plough Corp., 231 N.J. 234, 246 (2017) (quoting Rudbart v. N.J. Dist. Water Supply Comm'n, 127 N.J. 344, 353 (1992)).  In evaluating whether an adhesion contract is unconscionable, courts consider "the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the 'adhering' party, and the public interests affected by the contract."  Id. at 247 (quoting Rudpart, 127 N.J. at 356).

Plaintiff argues the waiver was an illegal contractual limitation on her right to bring a retaliation action pursuant to the LAD, and in support cites Rodriguez and EEOC v. Lockheed Martin Corp., 444 F. Supp. 2d 414, 420-22 (D. Md. 2006), where the court held that an employer may not require an employee to contractually waive the right to file an EEOC charge in order to receive an employee benefit. Plaintiff argues the court should not have permitted the question to go to the jury as to whether she had waived her right to bring a retaliation claim pursuant to the LAD, because it was illegal for defendants to limit her ability to bring that claim. Unlike in Rodriguez, however, the waiver was a negotiated agreement where plaintiff was represented by an attorney.

An agreement not to sue for future violations of the LAD is not enforceable. In fact, 29 U.S.C. 626(f)(1)(C) provides that a person "does not waive rights or claims that may arise after the date the waiver is executed." However, "[a] party who enters into a contract in writing, without any fraud or imposition being practiced upon him [or her], is conclusively presumed to understand and assent to its terms and legal effect." Rudbart, 127 N.J. at 353 (quoting Fivey v. Pa. R.R. Co., 67 N.J.L. 627, 632 (1902)). "In the absence of fraud," a person who signs a contract without reading it may not be relieved of

his or her responsibilities pursuant to the contract.  Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 386 (1960).

"[W]hen [a] contract provision is inconsistent with fair and honorable dealing, contrary to sound policy and offensive to good morals, courts have the authority to declare the provision void as against public policy." Saxton Constr. & Mgmt. Corp. v. Masterclean of N. C. Inc., 273 N.J. Super. 374, 377 (Law Div. 1992) (quoting Johnson v. Peterbilt of Fargo, Inc., 438 N.W.2d 162, 163-64 (N.D. 1989)).  Courts should use "a balancing test . . . to determine whether a contractual provision is void as against public policy" and "[i]n that balancing test, the 'public policy' is weighed against the enforcement of the contractual provision.  Id. at 377-78 (quoting Restatement (Second) of Contracts § 178(1) (Am. Law Inst. 1981)).

"'[A] clear mandate of public policy' conveys a legislative preference for a readily discernible course of action that is recognized to be in the public interest."  Hitesman v. Bridgeway, Inc., 218 N.J. 8, 34 (2014) (quoting Maw v. Advanced Clinical Commc'ns, Inc., 179 N.J. 439, 444 (2004)).  "A 'clear mandate' of public policy suggests . . . a high degree of public certitude in respect of acceptable vers[u]s unacceptable conduct."  Ibid. (second alteration in original) (quoting Maw, 179 N.J. at 444).

A-2677-17T2

Plaintiff cites Hamilton v. General Electric Co., 556 F.3d 428 (6th Cir. 2009), to establish that the waiver is void because she was forced to prospectively waive her right to sue, and the retaliation had not yet occurred. In Hamilton, the Sixth Circuit found that a "last chance agreement" was not effective in waiving the employee's right to bring a legal action respecting his future discharge because an employee may not prospectively waive rights under federal anti-discrimination statutes. Id. at 434-35. The Sixth Circuit distinguished between a waiver to settle a past claim and a waiver of future claims. Ibid. The only valid waiver is when an employee agrees not to pursue additional legal claims with respect to a particular event that has already occurred, but an employee cannot be held to agree to waive the pursuit of future violations. Ibid. As noted, New Jersey courts may look to federal case law to interpret the LAD. See Erickson v. Marsh & McLennan Co., 117 N.J. 539, 549 (1990).

Plaintiff, however, did not raise this argument with regard to future activity until her motion for a new trial or a JNOV. She alleged minimal improper activity subsequent to the waiver, and did not clearly delineate whether some of the activity occurred before or after she signed the waiver. Thus the waiver was not an impermissible waiver of suit for future retaliation.

16

### III.  Waiver not Ambiguous.

Plaintiff argues that the court erred because the waiver "was ambiguous and therefore unenforceable."  She cites <u>Atalese v. U.S. Legal Services Group</u>, 219 N.J. 430, 435 (2014) and <u>Garfinkel v. Morristown Obstetrics & Gynecology Associates</u>, 168 N.J. 124, 135 (2001), for the principle that when an arbitration clause provides for the waiver of a constitutional or statutory right, it must state its purpose clearly and unambiguously.  A waiver of rights in favor of arbitration, however, does not need to refer specifically to the LAD or list every statute by name.  <u>Garfinkel</u>, 168 N.J. at 135.  Nevertheless, "it should . . . reflect the employee's general understanding of the type of claims included in the waiver, e.g., workplace discrimination claims."  <u>Ibid.</u>

Plaintiff argues that the waiver made no mention that she waived her right to seek relief in court and did not state the nature of the claims she waived.  The waiver stated that plaintiff agreed to "irrevocably and unconditionally waive[], release and forever discharge[] any and all claims and/or rights" against the City and not to "file any charge, claim or complaint in any forum against the City."  Plaintiff was represented by counsel.  The incident involved her allegation that her cousin had been the victim of discrimination at work.  Surely counsel and

client considered discriminatory treatment against plaintiff when waiving all claims.

## IV. Dismissal of Other Defendants.

Plaintiff argues that the court erred by dismissing defendants then-Mayor Dawn Zimmer and Wilson because the evidence supported her LAD claims against them. We find no fault with the court's rulings.

The court granted defendants' motion for involuntary dismissal of Zimmer because plaintiff did not establish that Zimmer engaged in any improper activity. Even though Ippolito contacted Zimmer's office about her concerns, the mayor's staff directed Ippolito to go through the proper channels and did not become involved in plaintiff's discipline. As far as Wilson, the court found that she also did not engage in retaliation. According to the court, Wilson was "negligent" in performing her duties because she did not promptly investigate and process discrimination complaints, but there was no evidence that she retaliated against plaintiff. On the motion for a new trial or JNOV, the court reiterated that Wilson and Zimmer did not aid or abet the discrimination.

Rule 4:37-2(b) permits the court to grant a motion for involuntary dismissal of any action, or part thereof, if, at the end of the plaintiff's case, the court finds that the plaintiff has not established a right to relief. A dismissal is

A-2677-17T2

appropriate when "no rational jury could conclude from the evidence that an essential element of the plaintiff's case is present." Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 4:37-2(b) (2020). An appellate court reviews de novo a trial court's grant of a motion for involuntary dismissal. Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016).

Plaintiff argues that Wilson and Zimmer aided and abetted in the unlawful activity inasmuch as Wilson was negligent in performing her duties and the mayor knew of plaintiff's allegations but did not investigate the harassment complaints. Plaintiff cites Tarr v. Ciasulli, 181 N.J. 70, 83-85 (2004) for the notion that a supervisor may be held individually liable for aiding and abetting in violation of the LAD.

> [T]o hold an employee liable as an aider or abettor, a plaintiff must show that "[](1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.[]"
>
> [Id. at 84 (second alternation in original) (quoting Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 127 (3d Cir. 1999)).]

Factors that indicate whether a party has provided "substantial assistance" to the principal violator are:

19

(1) the nature of the act encouraged, (2) the amount of assistance given by the supervisor, (3) whether the supervisor was present at the time of the asserted harassment, (4) the supervisor's relations to the others, and (5) the state of mind of the supervisor.

[Ibid.]

The first factor is whether the party aided by Wilson and Zimmer performed a wrongful act that caused an injury. If plaintiff proves that other defendants retaliated against her, that factor might be present.

Next, Wilson and Zimmer would have to have been generally aware of their roles as part of an overall illegal or tortious activity at the time they provided assistance to individuals violating the LAD. Zimmer was told by Ippolito and Mestre that plaintiff was being harassed. Wilson knew that she did not promptly investigate and process harassment claims. Thus, it is possible that factor two was present.

Factor three is that Wilson and Zimmer must have knowingly and substantially assisted other defendants in retaliating against plaintiff. After painstakingly searching the evidence to find proof that Wilson and Zimmer knowingly and substantially assisted in retaliating against plaintiff, the court found no such evidence. After de novo review, we agree with the trial court's grant of defendants Zimmer and Wilson's motions for involuntary dismissal.

A-2677-17T2

## V. Evidentiary Rulings.

Plaintiff argues the court erred by barring relevant and probative testimony by sustaining objections to certain testimony during the course of the trial. A court's evidentiary rulings are entitled to substantial deference. Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 374 (2010). The court's determination to admit evidence will not be reversed absent a finding of abuse of discretion. Ibid. We find no abuse of discretion in the evidentiary rulings. Plaintiff's allegation that the court abused its discretion regarding the seating of certain jurors does not merit discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2677-17T2