**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0058n.06

**No. 09-3965**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

**Jan 27, 2011**

LEONARD GREEN, Clerk

BEREATHA KYLE-EILAND,

      **Plaintiff-Appellant,**

v.

ALBERT NEFF, c/o Ohio State University
Consulting Services; ANN SALIMBENE, c/o
Ohio State University Consulting Services;
LORENA WEBER, Ohio State University
Consulting Services; MARCIE NABER, Ohio
State University Consulting Services,

      **Defendants-Appellees.**

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO

                                           /

**BEFORE:**    **DAUGHTREY, CLAY and WHITE**, **Circuit Judges.**

      **CLAY, Circuit Judge.** Plaintiff Bereatha Kyle-Eiland appeals an order issued by the United

States District Court for the Southern District of Ohio, entered on July 6, 2009, granting summary

judgment in favor of Defendant Albert Neff in a suit charging retaliation in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a).

      For the reasons set forth below, we **AFFIRM** the district court's decision.

# BACKGROUND

## I.      Procedural History

Between December 12, 2005 and May 18, 2007, Plaintiff Bereatha Kyle-Eiland filed ten complaints with the Ohio Civil Rights Commission ("OCRC") and the U.S. Equal Employment Opportunity Commission ("EEOC"), charging racial discrimination and retaliatory action during her employment at The Ohio State University ("OSU"or the "University").

On August 1, 2007, Plaintiff brought suit against Defendants Albert Neff, Ann Salimbene, Lorena Weber and Marcie Naber, all employees of OSU, in the United States District Court for the Southern District of Ohio, claiming unlawful racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a), and racial discrimination in violation of the Equal Protection Clause under 42 U.S.C. § 1983.

On February 20, 2009, Defendants filed a motion for summary judgment, which was granted by the district court on July 6, 2009. On August 5, 2009, Plaintiff filed a timely appeal to this Court.[1]

## II.     Facts

### A.      Center for Learning Excellence

Bereatha Kyle-Eiland ("Kyle-Eiland"), an African-American female, worked at OSU for 17 years before her employment was terminated in May of 2007. Twelve of those years passed uneventfully, during which time Kyle-Eiland was promoted multiple times and worked at several

---

[1]Kyle-Eiland raises only the claim of Title VII retaliation, as to Defendant Albert Neff, on appeal.

different colleges within the University. At all times, Kyle-Eiland was an unclassified at-will employee.[2]

The events leading to this case began in January of 2006 when, after some difficulties as an administrative assistant in OSU's College of Nursing, Kyle-Eiland sought a new position within OSU.[3] Lynette Stump ("Stump"), an assistant to the dean of the College of Education and Human Ecology ("EHE") and a former co-worker of Kyle-Eiland's, recommended Kyle-Eiland for a position within EHE. Kyle-Eiland was hired, and on February 15, 2006, she began work as an administrative assistant for EHE and the Center for Learning Excellence ("CLEX"), on a split schedule.

During the days of the week when Kyle-Eiland worked at the EHE office, she understood that she would be under Stump's "functional" supervision. During the days when she worked at the CLEX building, she understood that she would be under the "functional" supervision of the Director of CLEX, Respondent Albert Neff ("Neff"). When this arrangement began, it was apparently Kyle-Eiland's belief that she would be subject to the *actual* supervision of Stump only, even though both Neff and Stump understood, and claim to have clearly communicated to Kyle-Eiland at the time of her hire, that she would be supervised by Neff.

According to Neff, Kyle-Eiland's primary responsibilities at CLEX were the preparation of various financial reports, along with light human resources and office management functions. The

---

[2]Ohio law creates a civil service system in which state employees are defined as either "classified civil servants" or "unclassified employees." Applicable definitions are set forth in Ohio Rev. Code Ann. §§ 124.01-124.99. *See also Christophel v. Kukulinsky*, 61 F.3d 479, 482 (6th Cir. 1995) (detailing differences between classified and unclassified employees under Ohio state law).

[3]During the course of her employment with the OSU College of Nursing, Kyle-Eiland filed three OCRC complaints charging racial discrimination and retaliation.

required financial reports were to be prepared for CLEX and four additional sub-projects, and were to be submitted to Neff (or other project directors) on a monthly and on-demand basis.

From the outset, Neff seems to have been dissatisfied with the quality of the reports that Kyle-Eiland produced. According to Neff, the reports that he received were not in the format requested, nor were they usable for the purposes intended. Neff apparently spoke with Kyle-Eiland about his expectations for the reports on more than one occasion, to little or no effect. Neff was also concerned about Kyle-Eiland's interpersonal skills, having heard from various project directors that she had been rude or abrupt in professional discussions.

According to Kyle-Eiland, she was not placed under Neff's actual supervision until sometime after August 1, 2006, and so was under no obligation to follow his orders or meet his performance expectations. She additionally asserts that she received contradictory instructions, on more than one occasion, about the necessity of doing reports in the format requested by Neff.

In August of 2006, Neff approached the human resources manager for EHE, Lorena Weber ("Weber"), to discuss his complaints about Kyle-Eiland's work performance. After consulting with Weber, Neff wrote a performance improvement plan ("PIP") for Kyle-Eiland, in which he outlined the issues in Kyle-Eiland's job performance that were of concern to him. Neff and Weber contacted Kyle-Eiland to institute the PIP on August 22, 2006. Kyle-Eiland claims that this is the first time she was made aware that the supervision of her position "would be transferred" to Neff.

Kyle-Eiland, Neff and Weber met on November 9, 2006, to review and discuss the PIP.[4] The PIP outlined deficiencies in four areas: "financial reporting," "complaints," "timeliness," and "unexplained/unapproved absences." Kyle-Eiland produced a written response to the PIP, which loosely addressed each of these concerns. Kyle-Eiland explained the problems with financial reporting as stemming from cross-communications within the college, which led her to believe that the reports requested by Neff were not required; she generally denied problems with purchasing, paying vendors and keeping inventory; she also denied accusations of rudeness and unapproved absences.

Although Kyle-Eiland does not assert that either Neff or Weber knew that she had previously filed OCRC/EEOC complaints within the University when they initially met concerning the PIP, on November 9, 2006, Kyle-Eiland filed an OCRC complaint charging discriminatory retaliation by Neff.[5] The complaint does not specifically mention the PIP, but instead claims that Stump told Kyle-Eiland that she had to "look out for [her]self" and that Neff was "trying to fire [her] or make [her] quit."

Neff and Weber deny having any knowledge of Kyle-Eiland's previous OCRC complaints at the time of the first PIP meeting; Kyle-Eiland states that she has no knowledge of anyone ever discussing her previous OCRC complaints with Neff. Furthermore, there is no evidence in the

_____

[4]The meeting was delayed because Kyle-Eiland was on FMLA leave through September and October.

[5]Kyle-Eiland received a right to sue letter for this charge from OCRC on February 14, 2008.

record to show that any of the OCRC complaints were available in Kyle-Eiland's OSU personnel file, or that Neff or Weber had seen Kyle-Eiland's personnel file prior to the initiation of the PIP.

On December 14, 2006, Neff, Weber, Kyle-Eiland and her attorney, Michael Moses, met for a second time regarding the PIP. Neff asserts that there had been no significant improvement in Kyle-Eiland's performance following the initiation of the PIP, and this was apparently conveyed to Kyle-Eiland at the meeting. Following the meeting, Neff set up training sessions between Kyle-Eiland and Christina Fultz ("Fultz"), Kyle-Eiland's predesessor at CLEX, in order to facilitate Kyle-Eiland's improvement in her reporting functions. Fultz and Kyle-Eiland met for a total of approximately 40 hours in and around February of 2006 in order for Fultz to train Kyle-Eiland. Kyle-Eiland claims that after training with Fultz she began to produce reports to Neff's specifications; Neff does not agree.

In late December 2006 or early January 2007, Kyle-Eiland contacted a resource management analyst at OSU's Office of Finance, Don Seidelmann ("Seidelmann"), concerning a deficit on the CLEX account. After some discussion over email, Kyle-Eiland and Seidelmann set up a meeting to further discuss the issue. Kyle-Eiland claims that Neff later cancelled that meeting; Neff claims that another OSU employee, Betsy Lindsay ("Lindsay"), canceled the meeting and that Neff only communicated that cancellation to Kyle-Eiland. Nonetheless, it is clear that Neff was displeased that Kyle-Eiland had contacted Seidelmann about the deficit, because Seidelmann did not work at CLEX and so was not in the "reporting line" for internal financial issues. Although no disciplinary action was taken on this issue, on January 4, 2007, Kyle-Eiland filed a charge with the OCRC, claiming retaliation in the form of discipline, harassment and hostile work environment, based on "constant

harassment [and] humiliation" from Neff.[6]   Kyle-Eiland cited the PIP, the cancellation of the Seidelmann meeting, and occasions when she claimed that she had been excluded from meetings as the factual basis of the charge.

On January 23, 2007, Kyle-Eiland filed a charge with OCRC claiming retaliation in the form of demotion, harassment and hostile work environment, which outlined complaints that were similar to those listed in the previous charge.[7]   Kyle-Eiland also claimed that her communications were being monitored by Weber, Neff and Lindsay.

During this time period, the College of Human Ecology and the College of Education merged.   Kyle-Eiland alleges that during the merger her access to "approval" functions for purchasing was downgraded to access to "initiating" functions only, and that her access to human resources timekeeping systems was removed.   She further claims that the funding structure of her position was changed—from university-funded to grant-based—which both increased her job insecurity and decreased her benefits package.   Kyle-Eiland acknowledges that all other employees at CLEX were on grant-based funding.   On May 8, 2007, Kyle-Eiland filed a charge with the OCRC, charging retaliation in the form of change of conditions of employment.[8]

By May of 2007, Neff had still seen no significant improvement in Kyle-Eiland's performance.   Neff therefore contacted the OSU Human Resources office ("OSU HR") to began procedures to discharge Kyle-Eiland.   In addition to continued problems with reporting, Neff cited

---

[6]Kyle-Eiland received a right-to-sue letter for this charge from OCRC on June 16, 2008.

[7]Kyle-Eiland received a right to sue letter for this charge from OCRC on June 16, 2008.

[8]Kyle-Eiland did not receive a right to sue letter for this charge.

Kyle-Eiland's failure to make timely payments to CLEX vendors and her failure to develop a key control system as instructed. After receiving approval from OSU HR, Neff provided Kyle-Eiland with a letter of termination on May 16, 2007, with an effective date of May 31, 2007. Kyle-Eiland left CLEX on the afternoon of May 16, 2007 and never returned to work. After Kyle-Eiland's departure, CLEX did not re-hire for her position.

Kyle-Eiland claims that she went to the offices of the OCRC to file a final retaliation charge on May 18, 2007, but OCRC has no record of a separate charge having been lodged at that time.

### B. Application to Other OSU Colleges

During the time that Kyle-Eiland was employed at CLEX, she submitted employment applications for approximately 40 other positions within OSU.[9] For the vast majority of these positions, Kyle-Eiland did not make it past the initial application screening. On at least three occasions, though, Kyle-Eiland reached a later stage of the selection process. One of these occasions is relevant to the claim before us now.

In July of 2007, Kyle-Eiland applied for an administrative associate position with the College of Math and Physical Sciences ("CMPS"). She was selected for a second round interview, which was conducted by the human resources director for CMPS, Marcie Naber ("Naber"), and the vice chair of CMPS, Luis Casian ("Casian"). Six other candidates were interviewed at this stage. Naber later contacted Kyle-Eiland to inform her that she was no longer in contention for the position and

---

[9]It appears that Kyle-Eiland began applying for other positions at OSU on February 14, 2006, the day that she began her EHE/CLEX position. (Compl. 26; Answer 4.)

would not be invited to the final round of interviews, because Naber and Casian had interviewed stronger candidates.

Kyle-Eiland states the she "knew that [Naber] knew" about the OCRC charges at the time of the interview, though her only supporting evidence is the general tenor of the discussion between Naber and Casian. Naber admits that she spoke to Weber about Kyle-Eiland and that Weber told her that Kyle-Eiland had filed an OCRC complaint, but asserts that this conversation occurred after she and Casian had already decided on another candidate. The candidate who was eventually hired for the position was an African-American female.

**DISCUSSION**

**I. Standard of Review**

This Court reviews the district court's grant of summary judgment *de novo*. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006). Evidence in the record is viewed in the light most favorable to the nonmoving party, and all reasonable inferences are drawn to the benefit of that party. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576-577 (6th Cir. 2004). Summary judgment is appropriate only where the evidence raises no genuine issues of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A "genuine issue of material fact" exists only where "its resolution might affect the outcome of the suit under the governing substantive law." *Walker v. Ohio Dep't of Rehab. and Corr.*, 241 F. App'x 261, 265 (6th Cir. 2007) (*citing Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir.

2004)). Identifying factual disputes that are "irrelevant or unnecessary" will not suffice to defeat summary judgment. *Anderson*, 477 U.S. at 248.

"If the defendant successfully demonstrates, after a reasonable period of discovery, that the plaintiff cannot produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment is appropriate." *Combs*, 354 F.3d at 576 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

## II. Analysis

### A. Administrative Exhaustion

"Prior to . . . bringing suit under Title VII in federal court, a plaintiff alleging discrimination must perform two administrative prerequisites: (1) file timely charges of employment discrimination with the EEOC, and (2) receive and act upon the EEOC's statutory notice of the right to sue." *Brown v. City of Cleveland*, 294 F. App'x 226, 233 (6th Cir. 2008). The plaintiff has ninety days from the time of the issuance of an EEOC right to sue letter to file a civil action. *See Williams v. Nw. Airlines, Inc.*, 53 F. App'x 350, 352 (6th Cir. 2002).

In this case, Kyle-Eiland filed the instant action on August 1, 2007. Since this date is more than 90 days after she received the September 11, 2006 right to sue letter covering her December 12, 2006; May 25, 2006; and June 19, 2006 charges, these claims are unexhausted and not properly before the Court. Kyle-Eiland has forwarded no argument for excusing or tolling this procedural requirement, either here of before the district court.

Because Kyle-Eiland never received a right to sue letter for the May 8, 2007 retaliation charge, and there is no evidence that she filed an OCRC charge on May 18, 2007, any claims relating to these charges are not properly before this Court for failure to administratively exhaust.[10]

### B. Title VII Retaliation

Title VII of the Civil Rights Act ("Title VII") prohibits an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

A plaintiff may establish a *prima facie* case of Title VII discrimination through direct or indirect (circumstantial) evidence. Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Circumstantial evidence is "proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). "At the summary-judgment stage,

---

[10]While acknowledging that Kyle-Eiland makes no effort to raise any argument to excuse her failure to administratively exhaust all claims, this Court notes the substandard recordkeeping and inconsistent system management at the OCRC, as evidenced in the record. It is therefore not inconceivable that Kyle-Eiland properly exhausted EEOC channels on these charges, and that this exhaustion is not reflected in the OCRC records. (*See* Dist. Ct. Op. 24-25.) (providing overview of problems at OCRC) Because of these discrepancies, we choose to address the merits of these charges in our analysis.

a plaintiff must adduce either direct or circumstantial evidence to prevail." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009).

In retaliation claims supported by circumstantial evidence, the plaintiff bears the burden of proving that "(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (emphasis omitted).

If the plaintiff can meet this showing, then "the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990) (*quoting McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the employer can articulate such a reason, then the plaintiff is required to "demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination." *Abbott v. Crown Motor Co., Inc.,* 348 F.3d 537, 542 (6th Cir. 2003). Although the burden of production shifts between the parties, "the ultimate burden of persuading the trier of fact . . . remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).

While what is necessary to prove pretext will vary from case to case, a plaintiff may prove pretext by showing that "(1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the

termination, or (3) the reason offered was insufficient to explain the employer's action." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008).

### C.    Application to Legal Framework

Kyle-Eiland contends that the district court erred in "effectively conduct[ing] a mini-trial on the paper record," instead of construing all evidence to the benefit of the nonmoving party, as is required in summary judgment review.[11] (Pl.'s Br. 44.) Defendant argues that Kyle-Eiland has failed to set forward a *prima facie* case of Title VII retaliation against Neff, and "moreover, even if she could present a *prima facie* case against Neff, Kyle-Eiland fails to demonstrate that Neff's stated reasons for removing her were pretextual." (Def.'s Br. 14.)

We find that, with all record evidence weighed her favor, Kyle-Eiland has failed to present a *prima facie* case of retaliation under Title VII. We therefore hold that the district court did not err in granting summary judgment to Defendant.

### 1.    Exercise of Protected Rights Known to Defendant

There is no evidence in the record to support a finding that Neff knew of Kyle-Eiland's OCRC charges during the period between her hire into CLEX and her termination from OSU. Neff squarely denies any knowledge of any OCRC complaints filed by Kyle-Eiland at any time. Kyle-Eiland presents no evidence to suggest otherwise.

---

[11]While Kyle-Eiland's brief acknowledges that "the court below made no specific finding as to whether evidence presented by Kyle-Eiland in support of her claims against Neff established a *prima facie* [sic]," (Pl.'s Br. 48), Kyle-Eiland does not now endeavor to set forth the *prima facie* case, but instead only focuses on the issues of causation and pretext. Nonetheless, because we find that Kyle-Eiland has failed to set forth such a case, we conduct a full analysis of the facts herein.

Kyle-Eiland instead argues that Weber's knowledge of her OCRC complaints (as evidenced through Weber's conversation with Naber) can be imputed to Neff, because Neff consulted with Weber regarding placing Kyle-Eiland on a PIP. But Weber testified that she had no knowledge of Kyle-Eiland's OCRC complaints at the time that she assisted Neff in preparation for the PIP; Weber does admit that she later learned of the OCRC complaints. Absent any evidentiary showing to the contrary, it is impossible for Kyle-Eiland to support her contention that Weber told Neff about her history with the OCRC.

Furthermore, there is no evidence that the OCRC contacted Neff, or anyone at OSU, regarding the complaints at or around the time at which they were filed. Nor is there anything to suggest that the complaints would have been placed in Kyle-Eiland's personnel file or in any other location where they would have been accessible to Neff, Weber or other OSU employees.

Therefore, Kyle-Eiland has failed to raise a material factual dispute regarding whether her protected activity was known to Neff.

## 2. Adverse Employment Action or Harassment

An "adverse employment action" requires a showing that "a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations omitted). We have held that "*de minimis* employment actions are not materially adverse and, thus, not actionable." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). The Supreme Court has limited "adverse

employment actions" to something more than "petty slights, minor annoyances, and simple lack of good manners." *Burlington Northern*, 548 U.S. at 68.

Kyle-Eiland has presented evidence sufficient for a reasonable factfinder to conclude that the PIP constituted an adverse employment action. Normally, "a negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's wages or salary." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007). But a negative performance evaluation may rise to the level of an adverse action if the employee can "point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation." *Morris*, 201 F.3d at 789. In this case, the PIP may have led directly to Kyle-Eiland's dismissal from CLEX.[12]

### 3. Causal Connection Between Activity and Adverse Action

Kyle-Eiland argues that "the temporal proximity of [her] complaints of discrimination, as evidenced by Weber's knowledge of the charge filing in her conversation with Marcie Naber, combined with the heightened scrutiny of her performance shortly before her discharge, is sufficient to demonstrate the causal nexus needed to establish a *prima facie* case." (Pl.'s Reply at 2.) In support, Kyle-Eiland cites this Court's decision in *Hamilton v. General Elec. Co.*, 556 F.3d 428 (6th Cir. 2009).

---

[12]Kyle-Eiland's termination from CLEX clearly constitutes an adverse employment action. But this claim is not before this Court as a result of Plaintiff's failure to administratively exhaust, as it was covered by no recorded EEOC/OCRC charge. We again note problems with OCRC's recordkeeping , however, and acknowledge that Kyle-Eiland asserts that she filed a charge covering the termination of her position. As discussed below, even if we entertained this claim, Kyle-Eiland cannot show Neff's reasons for firing her to be pretext.

The case now before us is easily distinguishable from *Hamilton*. In *Hamilton*, the first three elements of the *prima facie* case were undisputed, but defendants claimed that the plaintiff failed to establish the requisite causal connection. *Id.* at 435. The Court held that "the combination of . . . increased scrutiny with the temporal proximity of [plaintiff's] termination occurring less than three months after [plaintiff's] EEOC filing is sufficient to establish the causal nexus needed to establish a prima facie case." *Id.* at 435-436. In so determining, we built upon our precedent in *Mickey v. Zeider Tool & Die Co.*, where we held that "[w]here an adverse employment action occurs very close in time *after an employer learns of a protected activity*, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." 516 F.3d 516, 525 (6th Cir. 2008) (emphasis added).

In this case, Kyle-Eiland submits no evidence to indicate that Neff ever knew about her OCRC filings, either before or after he began the alleged period of "heightened scrutiny." Instead, Kyle-Eiland merely raises an accusation that Weber and Naber may have known of the OCRC charges during the relevant timeframe, which by way of "common sense" implicates Neff. Unfortunately, Kyle-Eiland points to no evidence to support this theory. And because there is no evidence that speaks to when Neff may have learned about the OCRC charges, if he ever did, Kyle-Eiland is unable to establish temporal proximity to the time of her termination.

Kyle-Eiland is also unable to show heightened scrutiny. In fact, Kyle-Eiland states that she knew of many people at CLEX who "had problems with Al Neff," including more than one white employee. (Kyle-Eiland Dep. 228.) And there is additional evidence to show that Neff placed more

than one person on a PIP during his tenure at CLEX.[13]  This evidence implies that Neff subjected many employees, regardless of race or exercise of protected activity, to intense scrutiny.

### 4.    Non-discriminatory Reasons for Employment Decisions

Assuming, for argument's sake, that Kyle-Eiland meets her initial burden of production, Neff offers several non-discriminatory reasons for his employment decisions.

Neff points to Kyle-Eiland's inability to create financial reports in the style requested; complaints he received about her interpersonal skills from at least one project director; her failure to complete assigned tasks (such as a kitchen inventory and the creation of a key system); her timeliness and absences from the office; and her late payments to several vendors as reasons for her termination.

### 5.    Pretext for Discrimination

Kyle-Eiland argues that the court can make a "reasonable inference from Neff's lack of any clear direction, training or progressive, or corrective action followed by his assertion of frivolous grounds for assessing her performance as deficient . . . prior to her termination," that his stated non-discriminatory reasons for Kyle-Eiland's termination are pretextual.  (Pl.'s Br. 44.)  Kyle-Eiland asserts that the district court therefore erred when it "weighed and rebutted that reasonable inference," instead of allowing the issue to be considered by a jury. (Pl.'s Br. 49.)

---

[13]There is evidence, in the form of testimony from Neff, to indicate that several other employees were placed on PIPs during the same general time period.  Amongst these employees was Carolyn Vesely, a white employee whom Kyle-Eiland references on several occasions as not being disciplined for actions similar to her own.

Kyle-Eiland's argument demonstrates a certain misunderstanding of the standard of review for summary judgment. The standard requires that "evidence in the record" be viewed in the light most favorable to the nonmoving party; it does not require that all bald assertions, opinions, or even genuinely held beliefs asserted by the nonmoving party be adopted wholeheartedly by a court, even when such assertions are completely unsupported by the record.

Nonetheless, Kyle-Eiland outlines the following material facts as remaining in dispute: "the absence of progressive discipline and [the] conflicting testimony about whether the requested financial reports were produced by Kyle-Eiland for Neff." (Pl.'s Br. 49.) Kyle-Eiland further argues, plainly stated, that Neff's assertion that he was disappointed with the form of the financial reports is completely fabricated. (Pl.'s Br. 50.) (implying that Neff "predetermine[d] a result and then construct[ed] a process and adopt[ed] criteria that produce[d] that result.")

An examination of the record reveals that the question of progressive discipline is not a disputed issue for at least three reasons. First, as an unclassified at-will employee, Kyle-Eiland was not covered by OSU's Corrective Action & Involuntary Termination Policy, and was not guaranteed the benefit of "progressive corrective action." Because she was unclassified staff, she was instead employed "at the discretion of [her] appointing authority" and could be terminated, under certain conditions, with no advance notice at all.

Secondly, there is no record evidence to indicate that unclassified employees were routinely granted the benefit of progressive discipline, which might support the implication that providing such discipline was the practice, if not the written policy, of CLEX or OSU.

Lastly, the record makes clear that Kyle-Eiland actually received some form of pre-termination discipline in the form of a written reprimand, a written PIP, a follow-up PIP, and several disciplinary meetings with Neff, though none of these actions were specifically required by OSU policy. Kyle-Eiland offers no articulation of, nor any document outlining, what other forms of corrective action she believes would have been necessary to satisfy the requirement of "progressive discipline."

Because there is no evidence in the record to indicate that Kyle-Eiland was guaranteed progressive discipline or otherwise subject to OSU's progressive corrective action policy, and because there is no disagreement about the forms of discipline that she did receive before her termination, this issue does not pose a material factual dispute.

Moving on to the issue of the financial reporting also reveals no disputes of material fact. The question here is not whether Kyle-Eiland believed that her work performance was acceptable; it is whether *Neff was satisfied* that Kyle-Eiland had properly produced the requested financial reports. The record shows that Neff consistently, from May 2006 until May 2007, expressed his dissatisfaction with the reports provided by Kyle-Eiland. He also approved Excel training courses for Kyle-Eiland and set up training meetings between Kyle-Eiland and Fultz, both of which suggest that he was unhappy with the reports and was attempting to facilitate Kyle-Eiland's improvement. There is also evidence on the record to show that Neff, on at least one occasion, sent Kyle-Eiland's reports to a third party to be either re-formatted or completely re-done, which further supports his claim that he not pleased with her reports. Kyle-Eiland presents no evidence to dispute any of these

facts. Instead, Kyle-Eiland merely asserts that she believed that she was producing reports in the manner requested.[14]

As highlighted above, Kyle-Eiland also implies that pretext should be found because Neff is just not very believable. Kyle-Eiland challenges Neff's credibility by arguing, for example, that "Neff's deposition testimony makes clear he has little understanding of the reports and budget documents he professed Ms. Kyle-Eiland had not sufficiently mastered." (Pl.'s Br. 21.) In addition to mischaracterizing Neff's deposition testimony, Kyle-Eiland incorrectly interprets the *Burdine* burden shifting requirement in this argument. Under the burden shifting framework, Neff is not required to forward a preponderance of evidence (or meet any standard of evidence at all) to prove a legitimate, non-discriminatory justification; he must only articulate a reasonable justification. At that point, the burden shifts back to Kyle-Eiland to forward evidence of pretext.

Furthermore, any disputes of fact regarding whether and how financial reports were produced would not be material, because the disposition of those questions would not affect the outcome of the case. As the district court found,

> Neff has offered multiple legitimate and nondiscriminatory reasons for discharging Plaintiff. In addition to the problems with the reports that Plaintiff eventually generated, Plaintiff had failed to pay the Concourse Hotel and the cleaning service as required. There is also no evidence that Neff knew that Plaintiff had created a key system as required, if indeed she did create such a system.

(Dist. Ct. Op. 16.)

---

[14]Notably, Kyle-Eiland does not assert that she was ever producing reports in the manner requested by *Neff*. On the contrary, she asserts only that she produced reports as directed by Stump, and that she produced reports in accordance with the training she received from Fultz.

Because Kyle-Eiland calls into question none of these other, non-discriminatory reasons for her termination, even if there were some dispute about whether Neff eventually became satisfied with her financial reporting, Neff's decision to dismiss her would still be based on legitimate grounds.

Because Kyle-Eiland concedes all pretext arguments other than those related to progressive discipline and financial reporting, and because these arguments are unpersuasive, we find that Kyle-Eiland has failed to present any material factual disputes supporting a finding of pretext.

## CONCLUSION

Because Kyle-Eiland presented no disputed issues of material fact regarding Defendant's knowledge of her protected activities and causation, two elements of the *prima facie* case for Title VII retaliation, and because she has failed to raise any material facts supporting a finding of pretext, the district court did not err when it granted summary judgment to Defendant.

We therefore **AFFIRM** the decision of the district court.