**NOT RECOMMENDED FOR PUBLICATION**
File Name: 15a0798n.06

**No. 15-5320**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| BARBARA GUNN, | ) | **FILED** |
|  | ) | Dec 07, 2015 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| SENIOR SERVICES OF NORTHERN | ) | COURT FOR THE EASTERN |
| KENTUCKY, | ) | DISTRICT OF KENTUCKY |
|  | ) |  |
| Defendant-Appellee. | ) |  |
|  | ) |  |

BEFORE: GRIFFIN and KETHLEDGE, Circuit Judges; and CLELAND, District Judge.[*]

GRIFFIN, Circuit Judge.

Plaintiff Barbara Gunn was fired from her position as Executive Director of Senior Services of Northern Kentucky after several years of operating the organization at a deficit. She filed suit against defendant agency, claiming she was discharged because of her sex in violation of federal and state anti-discrimination laws. The district court granted summary judgment in favor of defendant, holding that plaintiff could not demonstrate that defendant's legitimate, non-discriminatory justification was a pretext for unlawful discrimination. We affirm.

---

[*]The Honorable Robert H. Cleland, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

I.

Senior Services of Northern Kentucky ("SSNK") is a nonprofit corporation that, as the name suggests, serves the senior citizen population of northern Kentucky. Its mission is to enable local seniors to live dignified, independent lives. SSNK is governed by a Board of Directors, which selects an Executive Director to handle the day-to-day operations of the agency. Gunn served in that capacity beginning in September 2000, though at some point her title changed to President and CEO.

During Gunn's tenure, SSNK began to operate at a deficit. In November 2006, four months into its fiscal year, SSNK had a $101,000 operating deficit and a total consolidated deficit of $140,000. In June 2008, SSNK reported a consolidated deficit of $155,738 and a program services deficit of $81,653. Expecting additional decreases in revenue for 2009, the SSNK Board stated at a June 26, 2008, committee meeting that its goal was for management "to react to the cuts and achieve a balanced budget in 2009[.]" The committee meeting minutes also made clear, "A loss in 2009 is not anticipated to be funded by the Endowment."

The "Endowment" was a source of disagreement between the Board and management, and it is a focal point of this case. It is managed by a related entity, SCNK, Inc., and its sole purpose is to serve as a "funding mechanism if funds [are] available, making sure SSNK, which is the entity that provides the programs, can remain viable and continue to operate in this area." By 2007, the fund had grown to over $1,000,000. According to regulations established by the SCNK Board of Directors, it would only distribute about five percent of the value of the endowment to SSNK on an annual basis. In more recent years, however, SSNK began relying more heavily on the endowment. By 2009, with the endowment declining due to poor market conditions, SCNK indicated that "[it] d[id] not want to tap the fund regularly, but if a proper case

is presented, and monies are needed to continue operating, the intent of the endowment document is to serve SSNK."

Despite the Board's directive to achieve a balanced budget, by March of 2009, SSNK was operating at a deficit of $93,000. SSNK's deficit worsened in 2010. In April 2010, Gunn reported a deficit of $125,206, with an estimated year-end deficit as high as $150,000. The Board reiterated that "SSNK needs to balance the budget next year" and that "[t]he agency needs to build a business model that is sustainable, expanding its reach, and philanthropic money should be on top as a cushion."

In July 2010, Melissa Lueke became Chair of the SSNK Board and began in earnest to hold Gunn accountable for the budget deficit. Days before she became Chair, Lueke emailed Gunn, telling her that her number-one priority for Gunn and her staff was preparing a "[b]alanced budget with realistic revenue figures." On September 15, 2010, Lueke emailed fellow Executive Committee members, reporting that she "asked [Gunn] to be in a position to have a balanced budget to present at the Board Meeting" the following week. She continued, "I am going to set the expectation that Barb have a plan for a balanced budget and an organizational structure that will support the delivery of quality services by 9/30. . . . If Barb is not in a position to deliver on this on 10/1, we, the executive committee, are going to have to start making the decisions for Barb."

Nevertheless, by spring of 2011, SSNK continued to report budget deficits. At the May 25, 2011, Executive Committee meeting, management reported an operating deficit of $183,223 and a total consolidated deficit of $255,933. The forecasted year-end deficit for Fiscal Year 2011 was $281,417. Looking ahead, management projected a $100,000 deficit for Fiscal Year 2012. Despite the projected deficits, the Board "agreed SCNK, Inc. is not a possible

funding source at this time." The Board reasoned that "[t]he agency is in its 4th year of an operating deficit and needs to operate as a viable business at a break[-]even point on its own." The Board stressed that management needed to prepare a balanced budget by June 2011 and that "[m]anagement of that budget [was] imperative."

Gunn presented SSNK's budget for Fiscal Year 2012 at the next SCNK Board meeting on July 26, 2011. She projected a slight surplus. In response, SCNK approved a $100,000 grant to cover "SSNK operations through June 30, 2011, with the hope that the operating entity will generate enough surplus to pay back the endowment fund in the future."

Unfortunately, that hope was not realized. At the October 26, 2011, meeting of the SCNK Board and SSNK Executive and Finance Committees, management reported a deficit of $92,000. Management stated that "SSNK needs SCNK, Inc. to help fund operations for FY12 to break even." Management also presented a preliminary audit report regarding SSNK's finances, which identified five major concerns relating to SSNK's budget deficit. In addition, management advised the Executive Committee that, in order to receive a final unqualified opinion from the auditor, the agency would need to explain where the needed revenue will come from, as well as obtain a written commitment of funding from SCNK. In response, the Executive Committee made clear, "Expectations are for management to build a sustainable business model so SSNK operates at a surplus, not a deficit." Nevertheless, it agreed to request $100,000 from the SCNK endowment for Fiscal Year 2012, and directed Gunn and her staff to prepare a revised budget by the next month.

The revised budget revealed that SSNK's financial health was not improving. The updated forecast for Fiscal Year 2012 was a $164,000 deficit. That signaled the end of Gunn's tenure at SSNK. On December 21, 2011, the Executive Committee decided to terminate Gunn's

employment. At the next month's board meeting, the Board voted unanimously to terminate Gunn's employment, effective immediately. In the same meeting, the Board selected Ken Rechtin, the Director of Agency Services, to serve as Interim Executive Director. He served in that role until June 16, 2014, when he was replaced by full-time Executive Director, Jay Van Winkle.

Gunn filed suit against SSNK alleging that her termination was sex-based discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and Kentucky's corresponding state-law analogue, Ky. Rev. Stat. Ann. § 344.040(1)(a). After an opportunity for discovery, SSNK filed a motion for summary judgment on both claims. Plaintiff opposed the motion, claiming there were genuine disputes of material fact regarding whether defendant's articulated reason for terminating her was merely a pretext for sex-based discrimination. The district court rejected plaintiff's arguments and held that defendant was entitled to judgment in its favor as a matter of law. Plaintiff timely appealed.

## II.

We review de novo the district court's order granting summary judgment. *CMACO Auto. Sys., Inc. v. Wanxiang Am. Corp.*, 589 F.3d 235, 241 (6th Cir. 2009). Summary judgment is warranted if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c); *CMACO Auto. Sys., Inc.*, 589 F.3d at 241–42. A genuine dispute for trial exists "only when there is sufficient 'evidence on which the jury could reasonably find for the plaintiff.'" *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 605 (6th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986)). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 281 (6th Cir. 2012) (quotation marks omitted).

## III.

Title VII of the Civil Rights Act of 1964 makes it unlawful to "discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Kentucky state law provides a nearly identical prohibition on discriminatory employment practices, Ky. Rev. Stat. Ann. § 344.040(1)(a).[1] When a claim of sex discrimination is built on circumstantial evidence, as it is here, we use the three-step *McDonnell Douglas* burden-shifting framework for evaluating the propriety of summary judgment. *First*, the plaintiff must establish a prima facie case of discrimination; *second*, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action; and *third*, the plaintiff must demonstrate that the stated justification is merely pretext. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804 (1973)).

The parties in this case have taken the first two steps for us: defendant assumes for present purposes that plaintiff has stated a prima facie case; and plaintiff acknowledges that defendant has articulated two interrelated legitimate, non-discriminatory reasons for her termination—operating under a growing deficit and failing to establish a sustainable business

---

[1]Kentucky courts follow the federal courts' reading of Title VII in interpreting § 344. *See Bank One, Kentucky, N.A. v. Murphy*, 52 S.W.3d 540, 544 (Ky. 2001) ("This Court interprets KRS 344.040 in consonance with federal anti-discrimination law."). Therefore, our reasoning applies equally to both of plaintiff's claims.

model, which required SSNK to make withdrawals from SCNK's endowment fund to meet operating expenses. The parties dispute the third and final step—pretext.

Under the third step of the *McDonnell Douglas* framework, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 253. To establish pretext, the plaintiff may show that (1) the employer's stated reasons for terminating the employee have no basis in fact, (2) the reasons offered for terminating the employee were not the actual reason for the termination, or (3) the reasons offered were insufficient to explain the employer's action. *Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 545 (6th Cir. 2008). "[A] reason cannot be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger*, 681 F.3d at 285 (alteration omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Thus, regardless of which rebuttal method a plaintiff uses, "he always bears the burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him." *Id.* at 285 (alterations omitted). Again, the parties have honed our inquiry, focusing on the second and third avenues through which a plaintiff typically demonstrates pretext. We address each in turn.

A.

A plaintiff using the second approach to establish pretext must show that the proffered reason "did not actually motivate the defendant's challenged conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003). Under this approach, "the plaintiff admits the factual basis underlying the discharge and acknowledges that such conduct *could* motivate the dismissal, but attacks the employer's explanation 'by showing circumstances which tend to prove an illegal

motivation was *more* likely than that offered by the defendant.'" *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009)). "In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* (quoting *Manzer*, 29 F.3d at 1084). Plaintiff advances four arguments for why defendant's articulated justifications did not actually motivate its decision.

1.

Plaintiff argues that there is a genuine dispute of material fact whether the growing deficit actually motivated her termination. She points to evidence in the record showing that board members praised her work as leader of SSNK. This evidence includes two performance reviews in 2006 and 2009 indicating Gunn was performing satisfactorily; several salary increases based on merit; and a handful of communications from board members between May 2008 and May 2011 praising Gunn's work.

This evidence does not create a genuine dispute regarding whether defendant's performance-based justification actually motivated its decision to fire Gunn in December 2011. As the district court correctly noted, most of the evidence predates the period in which SSNK's financial health deteriorated considerably. Therefore, they have little bearing on whether the Board's later justification actually motivated its decision to terminate Gunn's employment. *See Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007) (holding that the plaintiff's "positive performance review" did not demonstrate pretext because it "occurred *prior to* the events that [the defendant] proffers as justification for placing [the plaintiff] on leave").

Plaintiff contends that this reasoning overlooks praise-worthy statements from Chairwoman Lueke in May and July 2011. In May 2011, Gunn circulated an agency-wide newsletter in which she wrote, "We are continuing to restructure and adjust our staffing pattern to reduce our current deficit." Lueke emailed Gunn in response, "Nice Job!" Lueke gave similar praise to Gunn at the July 2011 board meeting at which Gunn presented a projected budget surplus of nearly $3,000, "commend[ing] the staff for their work to achieve a balanced budget. It is a huge step forward." But these laudatory remarks were in response to Gunn's promising forecast about the fiscal year ahead. When it came to delivering on that projection, however, Gunn's performance fell short. Four months into the fiscal year for which Gunn predicted a budget *surplus*, SSNK was operating a six-figure *deficit*. It is entirely consistent for Lueke and the Board to praise plaintiff for positive forecasts and then hold her accountable for failing to actually achieve results. Because Lueke's remarks did not occur during the fall of 2011 (the period when SSNK's finances steeply declined despite a positive forecast presented by Gunn just months before), they do not demonstrate that defendant's stated justification was pretext.

In a related vein, plaintiff argues that the financial audit conducted in 2011 showed that, as of June 30, 2011, the auditor was able to give a favorable opinion of the agency's financial state. This, Gunn argues, is additional evidence that her handling of the budget did not actually motivate the decision to fire her. In fact, the record shows that the auditor presented a preliminary report in October 2011, flagging five areas of concern; management also indicated that, in order to obtain an unqualified, favorable opinion, SSNK would have to obtain additional revenue from SCNK and a written commitment for future funding. In other words, the auditor was only able to provide an unqualified opinion in February 2012, *after* the SSNK Board requested funds from the endowment, something the Board was previously disinclined to do

without a sustainable business model. Rather than raise the inference of pretext, the series of events surrounding the financial audit only reinforces the narrative that Gunn was unable to meet the Board's performance expectations, *i.e.*, resolve the agency's fiscal problems without drawing from the endowment fund.

2.

Plaintiff also argues that the budget deficit was a consequence of circumstances outside of her control and that a sustainable business model without help from the endowment was impossible. The SSNK Board knew this, plaintiff says, yet established a performance expectation on October 26, 2011, for her to build a sustainable business model. Plaintiff contends that the Board's expectation to solve the budget deficit in two months creates an issue of fact as to whether she was "set up to fail."

Plaintiff's set-up-for-failure argument is based on the incorrect premise that the Board first set its expectation for a sustainable business model in October 2011 and that she had only two months to achieve that goal. The record shows that, as early as 2008, the Board was working with Gunn to build a sustainability plan. In June 2008, the SSNK Board established a timeline for implementing its sustainable business model, which included balancing the budget in 2009, establishing a delivery model by 2011, and growing the agency through to 2013. The Board reiterated its expectation for a balanced budget without assistance from the endowment over the course of the next several years. In April 2010, the SSNK Board agreed that "SSNK needs to balance the budget by next year" and that "[t]he agency needs to build a business model that is sustainable, expanding its reach, and philanthropic money should be on top as a cushion." And in May 2011, the Board concluded that "SCNK, Inc. is not a possible funding source at this

time. The agency is in its 4th year of an operating deficit and needs to operate as a viable business at a break[-]even point on its own."

It is beyond dispute that the Board consistently expressed its expectation for achieving a sustainable business model, as well as its aversion for requesting distributions from SCNK to achieve that goal. It is equally undisputed that Gunn knew her task was to implement a sustainable business model to achieve a balanced budget. Plaintiff herself testified during her deposition, "That was always a part of the job of the executive director." In short, October 2011 was not the beginning, but the end, of the Board's campaign to work with Gunn to build a sustainable business model. We disagree with plaintiff that the timeline or reasonableness of the Board's expectations creates an inference of pretext.

3.

Plaintiff also seeks to demonstrate pretext by showing that the Board failed to follow the organization's progressive disciplinary procedures, which included verbal counseling, written warnings, suspension, and finally, termination. She argues that the disciplinary procedures applied to her and that the organization followed this protocol for male employees, but not her. Defendant disputes that the disciplinary procedures even applied to Gunn as President and CEO. We need not resolve this dispute because, even if the disciplinary procedures applied to Gunn on some modified basis, the record demonstrates that she received numerous verbal and written warnings about her failure to meet performance expectations.[2]

---

[2]We harbor serious doubts whether plaintiff's bare assertion that the policy applied to her, without any additional support in the record, creates a genuine dispute of fact. *See Kyle-Eiland v. Neff*, 408 F. App'x 933, 943 (6th Cir. 2011) ("[The summary judgment standard] does not require that all bald assertions, opinions, or even genuinely held beliefs asserted by the nonmoving party be adopted wholeheartedly by a court, even when such assertions are completely unsupported by the record."). The policy itself states that "[t]he Executive Director[]

At various board and committee meetings—the setting one would reasonably expect such verbal counseling and written warnings to an organization's chief executive officer to take place—the Board repeatedly emphasized to Gunn the importance of achieving a balanced budget. This emphasis carried over to private communications between board members and Gunn, as evidenced by various email communications in the record. Plaintiff acknowledged during her deposition that she knew the Board expected her to build a sustainable business model and that achieving a balanced budget was her responsibility as President and CEO.

Furthermore, although failure to follow internal disciplinary procedures can be evidence that an employee's poor performance was not the real reason for her termination, *see Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 369 (6th Cir. 2007), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc), not every technical failure to follow disciplinary protocol is necessarily evidence of pretext. *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005) (holding that evidence that the defendant circumvented its own policies did not demonstrate pretext, in part because the departures were "minor"); *see also Macy*, 484 F.3d at 369. An employer's failure to follow internal disciplinary protocols is most probative when coupled with evidence that the employer followed the protocols for people outside of plaintiff's protected class. *Felder v. Nortel Networks Corp.*, 187 F. App'x 586, 595 (6th Cir. 2006). In this case, plaintiff baldly asserts that SSNK applied its disciplinary policy to male employees, but cites no evidence in the record to support her claim, especially with respect to others under direct supervision of the Board. Such

---

reviews and approves all recommendations for termination prior to any final action . . . ." Plaintiff admitted during her deposition that she would not approve her own termination, which would logically render this procedure inapplicable to someone in her position. Nevertheless, we conclude plaintiff's argument fails for the alternative reasons stated above.

"conclusory and unsupported allegations, rooted in speculation," are insufficient to create a genuine dispute of material fact for trial. *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003); *see also Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of . . . discrimination."). For these reasons, plaintiff has failed to demonstrate that the Board's purported failure to follow SSNK's disciplinary protocol is evidence of pretext for gender-based discrimination.

4.

Plaintiff next argues that the changing nature of defendant's articulated reason for termination shows that its stated justification did not actually motivate her termination.

When Lueke initially informed Gunn of her termination on December 27, 2011, she said that the Board lost confidence in Gunn's ability to lead the agency. When pressed for specifics, Lueke listed the fact that she had not consolidated SSNK's offices and could not make decisions without assistance from the Board or consultants. Several weeks later, Lueke told Gunn that her termination was a "performance issue." In response to this lawsuit, SSNK stated that the reason for Gunn's termination was because SSNK operated under a growing budget deficit for five years, and Gunn failed to establish a sustainable business model, requiring SSNK to draw from the SCNK endowment to meet operating expenses. According to plaintiff, these evolving justifications demonstrate pretext.

"An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). However, amplifying the core reason that initially drove the employer to discharge an employee—here, the Board's loss of confidence in Gunn's leadership—with additional, but

consistent, non-discriminatory reasons does not constitute "shifting justifications." *Alexander v. Ohio State Univ. Coll. of Soc. Work*, 429 F. App'x 481, 489–90 (6th Cir. 2011) (per curiam). Here, no inference of pretext is warranted because each of SSNK's stated reasons is consistent with the others, and all relate to the same basic concept: plaintiff failed to adequately perform as President and CEO. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 351 (6th Cir. 1998). Because there is no material inconsistency in SSNK's articulated reasons for terminating plaintiff's employment, this evidence is insufficient to raise an inference of pretext.

B.

Finally, under the third approach to establishing pretext, plaintiff argues that her failure to cut the deficit was insufficient to warrant firing her because similar action was not taken against a similarly-situated employee. Under this method of establishing pretext, plaintiff must demonstrate that other employees outside of her protected class were not fired, even though they were similarly situated and engaged in substantially identical conduct to that which the employer contends motivated its decision. *Smith*, 220 F.3d at 762. To be similarly situated, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352. Although exact correlation is not required, "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." *Smith*, 220 F.3d at 762 (quotation marks omitted).

Gunn argues that she was treated differently than her successor, Ken Rechtin, who also failed to eliminate the deficit, yet continued in his position for nearly thirty months. Gunn's

comparison is not apt. First, although SSNK is still operating with a budget deficit, Rechtin cut the deficit considerably. Whereas, the consolidated deficit for the year prior to Rechtin's promotion was over $200,000, the deficit dropped to $65,000 under Rechtin's leadership, with a projected deficit for the upcoming fiscal year of only $14,000. Rechtin's performance differs tangibly from that of Gunn's, removing a necessary premise from which to draw an inference of pretext. *See Seay v. Tennessee Valley Auth.*, 339 F.3d 454, 479 (6th Cir. 2003) (holding that fellow employees were not "similarly situated" for purposes of disparate treatment claim because they engaged in different conduct, justifying differential treatment). Because Rechtin did not engage in "substantially identical conduct to that which [SSNK] contends motivated its discharge of [Gunn]," *i.e.*, operating under a growing deficit, his continued employment does not create an inference of discrimination regarding plaintiff's termination. *Smith*, 220 F.3d at 762.

IV.

"Time and again we have emphasized that [o]ur role is to prevent unlawful [employment] practices, not to act as a super personnel department that second guesses employers' business judgments." *Corell v. CSX Transp., Inc.*, 378 F. App'x 496, 505 (6th Cir. 2010) (first alteration in original). The evidence cited by plaintiff shows an organization struggling to make ends meet, a Board of Directors looking to their chief executive for answers, and an executive who was ultimately unable to produce tangible results. It does not, however, demonstrate pretext. Therefore, we affirm the district court's grant of summary judgment.